THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| WOMEN'S HEALTH CENTER OF WEST VIRGINIA, *on behalf of itself, its staff, and its patients*; and DR. JOHN DOE, *on behalf of himself and his patients*, <br><br>                                *Plaintiffs*, <br><br> v. <br><br> ASHISH P. SHETH, *in his official capacity as President of the West Virginia Board of Medicine*; and MATTHEW CHRISTIANSEN, *in his official capacity as Secretary of the West Virginia Board of Medicine*, <br><br>                                *Defendants*. | Civil Action No.  2:23-cv-00079 <br><br> Hon. <br><br> **COMPLAINT** |

## INTRODUCTION

1.      On September 13, 2022, the West Virginia Legislature enacted House Bill 302 ("HB 302," attached hereto as Exhibit A), which severely restricts the circumstances in which abortion can be provided and imposes new, irrational requirements on *how* abortion care can be provided. In particular, HB 302 requires that all abortion procedures be performed "in a hospital," rather than in an outpatient setting (the "Hospitalization Requirement"), and that all physicians who provide, *inter alia*, medication abortion have "hospital privileges" *somewhere* in West Virginia (the "Privileges Requirement"). W. Va. Code §§ 16-2R-3(f)–(g) (collectively, the "Care Restrictions"). HB 302 also contains a comprehensive non-severability scheme. *See, e.g.*, *id.* §§ 16-2R-9, 16-2F-9, 16-2I-9, 16-2O-1(e), 16-2P-1(d), 16-2Q-1(m), 33-42-8(d).

2.      The Care Restrictions cannot survive even rational basis review. Procedural abortion is one of the safest outpatient procedures provided today—far safer than, for example, colonoscopies—and has been almost exclusively provided in the outpatient setting in West

Virginia for nearly fifty years.  In fact, for nearly half a century, court decisions have repeatedly established that there is no justification for such hospitalization requirements.  There is simply no legitimate, rational reason to suddenly restrict this safe, routine, outpatient gynecological care to the hospital setting.

3.      The Privileges Requirement is equally irrational, particularly given that, in light of the Hospitalization Requirement, it effectively applies *only* to medication abortion.  Hospital privileges are granted to physicians who perform procedures that require hospital-level resources or who manage significant, chronic illnesses requiring frequent inpatient treatment, such as cardiac surgeons or oncologists—not for the routine prescription of medications.  The lack of any logical relationship between the Privileges Requirement and legitimate state interest here is all the more striking given that the medications used in a medication abortion are proven to be safer than, for example, Tylenol and penicillin.  Here too, courts have routinely recognized that there is no conceivable justification for requiring hospital privileges for *any* form of abortion care, let alone for medication abortion only.

4.      As set forth further below, HB 302's irrational Care Restrictions have made it impossible for Plaintiff, the Women's Health Center of West Virginia ("WHC")—West Virginia's sole abortion clinic—and its primary physician at the time HB 302 was enacted, Plaintiff Dr. John Doe, to continue providing any abortion care at all.  This has inflicted and is continuing to inflict irreparable harm not only on Plaintiffs' mission, purpose, and ability to practice their profession and their constitutional rights, but also on the health and wellbeing of their patients and West Virginians seeking access to this essential care.

5.      Accordingly, Plaintiffs seek declaratory and preliminary and permanent injunctive relief against the enforcement of HB 302.

## JURISDICTION AND VENUE

6.     This court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3)–(4).

7.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure, under *Ex parte Young*, 209 U.S. 123 (1908).

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial amount of the events giving rise to this action occurred and continue to occur in this district and Defendants, who are sued in their official capacities, carry out their official duties in this district.

## PARTIES

### A.     Plaintiffs

9.     Plaintiff Women's Health Center of West Virginia is a nonprofit corporation organized under the laws of the State of West Virginia, and based in Charleston, Kanawha County, that provides a wide range of reproductive and sexual health services, including birth control, breast and cervical cancer screenings, treatment for sexually transmitted infection, treatment for hypertension, gender-affirming hormone therapy, pre-exposure prophylaxis, and screening for depression, anxiety, and intimate partner violence.  Prior to the enactment of HB 302, WHC was also the only outpatient health center offering abortion care in West Virginia and had provided that care since 1976.  But for HB 302's Care Restrictions, WHC could continue to provide abortion. WHC sues on behalf of itself, its staff, and its patients.

10.     Plaintiff Dr. John Doe is a board-certified family medicine physician licensed to practice medicine in multiple states, including West Virginia.  But for HB 302's Care Restrictions, Dr. Doe would be the primary provider of abortion care at WHC.  Dr. Doe sues on his own behalf and on behalf of his patients.

**B.** **Defendants**

11. Defendant Ashish Sheth, M.D., is the President of the West Virginia Board of Medicine (the "Board"), located at 101 Dee Drive, Suite 103, Charleston, West Virginia. The Board is "the sole authority for the issuance of licenses to practice medicine and surgery" in West Virginia, W. Va. Code § 30-3-5, and "shall regulate the professional conduct and discipline of such individuals," *id.* § 30-3-7(a). Under HB 302, a physician accused of "knowingly and willfully perform[ing], induc[ing], or attempt[ing] to perform or induce an abortion, with the intent to violate the provisions of § 16-2R-3 of this code," is subject to disciplinary action by the Board and, if proven, mandatory license revocation. W. Va. Code § 16-2R-7. Pursuant to West Virginia Code § 30-3-8, a disciplinary complaint against a physician is legally invalid unless signed by the President of the Board. *See Hoover v. W. Va. Bd. of Med.*, 602 S.E.2d 466, 470 (W. Va. 2004). Defendant Sheth is sued in his official capacity.

12. Defendant Matthew Christiansen, M.D., M.P.H., is the Secretary of the Board, located at 101 Dee Drive, Suite 103, Charleston, West Virginia. The Board is "the sole authority for the issuance of licenses to practice medicine and surgery" in West Virginia, W. Va. Code § 30-3-5, and "shall regulate the professional conduct and discipline of such individuals," *id.* § 30-3-7(a). Under HB 302, a physician accused of "knowingly and willfully perform[ing], induc[ing], or attempt[ing] to perform or induce an abortion, with the intent to violate the provisions of § 16-2R-3 of this code" is subject to disciplinary action by the Board and, if proven, mandatory license revocation. W. Va. Code § 16-2R-7. Pursuant to West Virginia Code § 30-3-8, a disciplinary complaint against a physician is legally invalid unless signed by the Secretary of the Board. *See Hoover*, 602 S.E.2d at 470. Defendant Christiansen is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.** **Abortion Is Common, Safe, and Essential Outpatient Health Care**

13.     Abortion is a basic component of comprehensive health care.  Approximately one in four women in the United States will obtain an abortion by the age of 45.

14.     Abortion is also one of the safest medical procedures available in the United States. Serious complications—that is, complications requiring hospitalization, surgery, or blood transfusion—from abortion care are exceedingly rare, occurring in fewer than 1% of abortions. Among women aged 15–49, only 0.01% of all emergency room visits per year are related to abortion.

15.     The mortality risk for abortion is lower than that of many other common procedures.  For example, one recent and robust analysis found that in the United States, the mortality rate for colonoscopy is 2.9 per 100,000 procedures; the mortality rate for tonsillectomy ranges from 2.9 to 6.3 per 100,000 procedures; and the mortality rate for plastic surgery is 0.8 to 1.7 per 100,000 procedures.  By contrast, the mortality rate for legal induced abortion is only 0.6 to 0.7 per 100,000 procedures.

16.     Abortion is far safer than its only alternative—continuing a pregnancy to term and childbirth.  Indeed, the mortality rate for childbirth is approximately 14 times greater than that associated with abortion.  Complications related to carrying a pregnancy to term and childbirth also are much more common than abortion-related complications.

17.     There are two main methods of outpatient abortion: procedural and medication.

18.     During the first trimester and early second trimester, procedural abortion typically refers to the use of gentle suction to empty the uterus (aspiration abortion).  The procedure is short in duration, typically taking about five to eight minutes.  This is the same procedure used to treat an early miscarriage after embryonic or fetal demise has occurred naturally.  There is no difference

in the risk of complications between aspiration used to terminate a pregnancy during the first and early second trimesters (abortion) and the identical procedure used to manage early miscarriage after demise has already occurred.

19.     Although certain outpatient abortion methods (*i.e.*, aspiration abortion) are sometimes referred to as "surgical abortion," that is a misnomer, as they do not entail typical characteristics of surgery, such as an incision into bodily structures.  According to the American College of Obstetricians and Gynecologists ("ACOG"), the leading professional organization for obstetrician-gynecologists, these methods are more appropriately characterized as a procedure, which is defined as a "short interventional technique that includes the following general categories . . . non-incisional diagnostic or therapeutic intervention through a natural body cavity or orifice" and is "generally associated with lower risk of complications."[1]

20.     Procedural abortion is analogous to other gynecological procedures that also take place in outpatient settings in terms of risks, invasiveness, instrumentation, and duration.  In addition to being identical to the procedure used to manage early miscarriage, early procedural abortions are also identical to, for example, certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing (though different levels of sedation may be used).

21.     Procedural abortion (*i.e.*, aspiration abortion) is almost always provided in an outpatient clinic or office.

22.     Medication abortion in the first trimester typically involves ingestion of two medications: mifepristone and misoprostol.  The first drug, mifepristone, is a progesterone antagonist, which means that it blocks the body's receptors for progesterone, a hormone required

---

[1] ACOG's clinical guidelines, policies, and position statements for the practice of obstetrics and/or gynecology are based on high-quality, peer-reviewed studies and research.

for the continuation of the pregnancy.  The patient first takes the mifepristone and then, several hours or days later (usually 24-to-48 hours), takes the misoprostol.  Misoprostol causes the uterus to contract and expel its contents, generally within hours.  Medication abortion has been proven to be safe and effective through 11 weeks from the last menstrual period ("LMP").

23.    An identical regimen may be offered to patients experiencing miscarriage as an alternative to procedural treatment.

24.    The FDA permits patients to self-administer each drug in a location of their choosing, without clinical supervision, and patients may take the medications at home or a similar private location.

25.    For some patients, medication abortion offers important advantages over procedural abortion.  Some patients prefer medication abortion because it feels more "natural" to them to have their body expel the pregnancy rather than have instruments inserted into the uterus by a provider to empty it.  Some patients choose medication abortion because of fear or discomfort around a procedure involving instruments.  For example, victims of rape and people who have experienced sexual abuse, molestation, or other trauma may choose medication abortion to feel more in control of the experience and to avoid further trauma from having instruments placed in their vagina.

26.    The risk of serious complications related to medication abortion is extremely low. According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."

II.   **WHC Has Provided Safe and Effective Abortion Care in West Virginia for Nearly Five Decades**

27.   WHC has been providing quality reproductive health care, including abortion, to West Virginians since 1976.  WHC was the first provider of outpatient abortion care in West Virginia and, and from 2016 until the time HB 302 was enacted, was the only known such provider in the State.

28.   WHC offers a wide range of other health care services in addition to abortion, including birth control, breast and cervical cancer screenings, treatment for sexually transmitted infection, treatment for hypertension, gender-affirming hormone therapy, pre-exposure prophylaxis, and screening for depression, anxiety, and intimate partner violence.  WHC also offers a variety of support programs for patients.  For example, WHC's "Right from the Start" program provides pregnancy and parenting support services to high-risk, Medicaid-insured pregnant people and infants through age one.

29.   WHC is considered an outpatient or office-based health care provider.  WHC is not a hospital, as defined under West Virginia law.  *See* W. Va. Code § 16-5B-1 (defining "hospital" as "any institution, place, building or agency in which an accommodation of five or more beds is maintained, furnished or offered for the hospitalization of the sick or injured").

30.   Prior to the enactment of HB 302, WHC provided abortion services two days per week.

31.   At the time HB 302 was enacted, WHC provided procedural abortion (aspiration abortion) from 4 weeks and 0 days through 16 weeks and 0 days of pregnancy, as measured from the first day of a patient's LMP.

32.   WHC has a written protocol to determine which patients are eligible for procedural abortions.  Following these protocols, WHC physicians assess a patient's eligibility using blood

8

tests, ultrasounds, and in-depth questionnaires relating to the patient's medical history and medications.

33.     At the time HB 302 was enacted, WHC provided medication abortion from 4 weeks and 0 days through 11 weeks and 0 days LMP.  WHC prescribed and dispensed both drugs— mifepristone and misoprostol—to the patient in-person.  The mifepristone was taken orally at the Center.  The second pill, misoprostol, was not taken until 24 to 48 hours later at a setting of the patient's choosing, usually at the patient's home.

34.     As with procedural abortion, WHC has a written protocol to determine which patients are eligible for medication abortions.  Following these protocols, WHC physicians assess a patient's eligibility using blood tests, ultrasounds, and in-depth questionnaires relating to the patient's medical history and medications.

35.     In 2021, WHC provided 1,304 abortions.  Of those, 611 (47%) were procedural abortions, and 693 (53%) were medication abortions.  Of the 1,304 abortions WHC provided in 2021, 608 patients (47%) came from outside of Charleston.

36.     From January to September 13, 2022, when WHC was forced to cease providing abortion care due to HB 302, WHC provided 797 abortions.  Of those, 374 (47%) were medication abortions, and 423 (53%) were procedural abortions.

37.     As of September 2022, when WHC was forced to cease providing abortion care due to HB 302, there were two physicians providing abortion care at WHC.

38.     One of these physicians is based in Charleston and has local hospital privileges. However, due to his schedule and the obligations of his private and hospital practice, this physician can only work two half-days per month at WHC.

39.     WHC's primary physician, Plaintiff Dr. Doe, performed the majority of abortions at WHC.  Dr. Doe is a West Virginia native and holds an active West Virginia medical license but currently resides out-of-state where he also maintains a family medicine practice and provides abortion care.

40.     As noted, prior to the passage of HB 302, WHC was the only known provider of abortion care in West Virginia and had been for over five years.

41.     Hospitals in West Virginia do not provide abortions, except in very limited circumstances, such as emergencies.

42.     That is consistent with nationwide data, which show that only 3% of abortions are performed in hospitals, and over 70% of hospitals perform fewer than 30 abortions per year, often under limited circumstances.

43.     As discussed below, HB 302's Care Restrictions have made it impossible for WHC to continue to provide any procedural abortion care and for Dr. Doe to continue to provide any medication abortion care at WHC.

III.    **The Legislature Enacts HB 302**

A.      **The 2022 Special Sessions**

44.     In the nineteenth century, West Virginia law made it a felony, punishable by up to ten years imprisonment, to perform or assist with the performance of an abortion.  *See* W. Va. Code § 61-2-8 (1882) ("criminal abortion ban").[2]  Though plainly inconsistent with *Roe v. Wade*, 410 U.S. 113 (1973), the criminal abortion ban was never formally repealed following *Roe*.

---

[2] In 1849, the Virginia General Assembly passed a criminal abortion ban, which West Virginia subsequently adopted when it became a state in 1863.  *See* Va. Code tit. 54, ch. 191, § 8 (1849); W. Va. Const. art. XI § 8 (1862).  In 1870, West Virginia affirmatively adopted a materially identical statute, codified in W. Va. Code § 61-2-8.  *See The Code of West Virginia Comprising Legislation to the Year 1870*, at 678, *available at* https://bit.ly/3a4capO.  West Virginia then

45.     Instead, in the years following *Roe*, the Legislature replaced the criminal abortion ban with a comprehensive non-criminal statutory framework that set forth the circumstances under which an abortion may be lawfully performed and obtained.  For example, West Virginia law permitted abortions during the first "twenty-two weeks since the first day of the woman's last menstrual period," *see* W. Va. Code §§ 16-2M-2(7), 16-2M-4, and permitted pregnant persons to elect an abortion prior to 22 weeks LMP for any reason, unless, with certain exceptions, the patient sought the abortion "because of a disability," *id.* §§ 16-2Q-1(b)–(c).

46.     At no point in history, whether before or after *Roe*, did West Virginia law contain any requirement that procedural abortions be performed in hospitals or that a physician providing any abortion care have West Virginia hospital privileges.

47.     On June 24, 2022, the U.S. Supreme Court issued its opinion in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), which overturned *Roe* and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

48.     On June 29, facing the potential revival of the criminal abortion ban after *Roe*'s fall, Plaintiffs here along with other members of WHC's staff filed suit in the Kanawha County Circuit Court seeking to enjoin enforcement of the criminal abortion ban.[3]  On July 18, the Circuit Court issued a preliminary injunction, holding in a bench ruling that Plaintiffs were likely to succeed on the merits of their claims that the criminal abortion ban had been impliedly repealed and was void for desuetude.  *See Women's Health Ctr. of W. Va. v. Miller*, No. 22-C-556, 2022

---

amended the statute in 1882, which was the version that remained in the West Virginia code until September 2022.

[3] *See* Verified Complaint, *Women's Health Ctr. of W. Va. v. Miller*, No. 22-C-556, 2022 WL 2526988 (W. Va. Cir. Ct. June 29, 2022).

WL 3443446 (W. Va. Cir. Ct. July 20, 2022), *appeal dismissed as moot sub nom. Morrisey v. Women's Health Ctr. of W. Va.*, No. 22-576 (W. Va. Oct. 6, 2022).

49.     The next month, on July 25, 2022, Governor Jim Justice called a special legislative session to consider new abortion legislation.[4]

50.     During this special session in late July, the Legislature considered—but ultimately could not agree on—new abortion legislation.[5]

51.     Specifically, on July 25, 2022, and within hours of Governor Justice's call for a special legislative session regarding abortion, the House of Delegates introduced HB 302 via the House Health & Human Resources Committee.[6]  The original House version of HB 302 did not contain hospitalization and/or privileges requirements, or anything comparable.

52.     Two days later, on July 27, the House of Delegates debated and passed its version of HB 302[7] and sent the bill to the Senate for consideration, without hospitalization and/or privileges requirements, or anything comparable.[8]

53.     On July 29, before voting on final passage of HB 302, the Senate debated and passed two amendments to the House's bill.  One amendment, offered by Senator Stephen Baldwin, amended the bill to allow victims to report an instance of rape or incest to someone other

---

[4] Press Release, Office of the Governor, *Gov. Justice Amends Special Session Call; Asks Legislature to Clarify and Modernize Abortion-Related Laws in West Virginia* (July 25, 2022), https://bit.ly/3WSHOcY.

[5] John Raby, *WVa Delays Chance to Pass 1st New Bill Since Abortion Ruling*, Associated Press (July 29, 2022), https://bit.ly/3U6oK9u.

[6] *See* HB 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/2p9cmz5z.

[7] *See* Bill Status Complete History, HB 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/22bj9nxa.

[8] The House of Delegates also debated a series of amendments to HB 302, of which two ultimately passed.  One amendment inserted statutory definitions for various terms in the bill, while the other made minor textual changes to the bill's language.  *See* Floor Amend. 7-27, adopted (Rep. Hardy), HB 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/4vz6nafx; Floor Amend. 7-27, adopted (Rep. Fast), HB 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/yd9zn9jd.

than a police officer.[9]   The other amendment, offered by Senators Tom Takubo and Michael Maroney, replaced the bill's criminal penalties provision with licensure penalties for physicians who perform prohibited abortions in violation of the statute.[10]   This amended version of HB 302 did not contain a hospitalization and/or privileges requirement, or anything comparable, either.

54.     During both the July 27 and July 29 plenary sessions, multiple legislators argued that pregnant people would falsely claim to be victims of rape or incest to receive abortion care. Delegate Brandon Steele, for instance, stated on July 27:  "What about my son?  What about my son when he messes up and maybe one day has a child out of wedlock, and that young lady's too afraid to own up to the mistake she made, and they make a false report against him just to get the abortion."  Similarly, in debating the rape exception, Senator Eric Tarr stated on July 29:  "If somebody's willing to go in and kill their baby, they're willing to lie, as well, to get it done."

55.     The Senate sent the amended bill back to the House of Delegates; the House of Delegates, however, refused to concur on the amended bill and instead requested a conference with the Senate.[11]

56.     By the evening of July 29, after a full day of legislative negotiation, the House of Delegates and Senate were unable to concur on a final version of HB 302.  Accordingly, both chambers of the Legislature voted to adjourn until recalled by the Senate President or the House Speaker.[12]

---

[9] *See* Floor Amend. 7-29, adopted (Sen. Baldwin), HB. 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/vjzdfr7y.

[10] *See* Floor Amend. 7-29, adopted (Sens. Takubo & Maroney), HB 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/2pnzfj9s.

[11] *See* Bill Status Complete History, H.R. 302, 3X Sess. (W. Va. 2022), https://tinyurl.com/22bj9nxa.

[12] Eric Douglas, *New Abortion Law Stuck in Limbo; Legislature Will Return in August*, W. Va. Public Broadcasting (July 29, 2022), http://bit.ly/3H9SWwz.

57.     Weeks later on September 12, the Legislature's leadership suddenly announced that both chambers would be reconvening the next day.[13]

58.     On September 13, Senator Takubo introduced a third version of HB 302, which included, for the first time, the Care Restrictions.[14]  In the span of a single day, both chambers of the Legislature introduced, debated, and passed the version of HB 302 that is at issue in this lawsuit.

59.     At no point did the Legislature consider or receive any testimony or evidence linking the Hospitalization or Privileges Requirements to any legitimate interest in the health or safety of abortion patients.

60.     Instead, Senator Robert Karnes acknowledged their purpose was to "shut down" WHC as the only remaining provider of abortion services in the state.  Specifically, Senator Karnes stated:

> [B]y requiring only medical doctors and osteopathic doctors to be able to prescribe, to be able to perform the abortions, and to require the admitting privileges at a local hospital . . .  I believe that maneuver, more than anything else that we've done, is what's going to shut down the abortion clinic here in West Virginia, and it's the only one we have[.]

*Id.*  Senator Tarr similarly stated:  "I'm confident this bill shuts down the abortion clinic."  Neither Senator Karnes nor Senator Tarr—nor any other legislator—suggested that the Care Restrictions served any medical purpose.

61.     The law took immediate effect upon passage.[15]

---

[13] Ian Karbal & Ellie Heffernan, *"Watch and See": The Whirlwind 24 Hours when West Virginia Republicans Banned Abortion*, Mountain State Spotlight (Sept. 18, 2022), https://bit.ly/3fkVT2e.

[14] *See* Floor Amend. 9-13, adopted (Sen. Takubo), HB 302, 3X Sess. (W. Va. 2022), https://bit.ly/3wcQ2kc.

[15] *See* HB 302, 3X Sess. (W. Va. 2022), http://bit.ly/3XH7DNH (enacted).

62.    That evening, WHC staff called dozens of patients to cancel their abortion appointments.   Some patients broke down and could not speak through their sobbing.   Some patients were stunned and didn't know what to say.   Some patients asked what they were supposed to do now.

**B.    HB 302**

63.    As relevant here, HB 302 enacts new restrictions on abortion, primarily codified in Chapter 16, Article 2R of the West Virginia Code; amends the prior statutory framework that regulated abortion in West Virginia post-*Roe*; and explicitly repeals the pre-*Roe* criminal abortion ban.

64.    Article 2R defines "[a]bortion" as "the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a patient known to be pregnant and with intent to cause the death and expulsion or removal of an embryo or a fetus."  W. Va. Code § 16-2R-2.

65.    Article 2R provides that "[a]n abortion may not be performed or induced or be attempted to be performed or induced unless in the reasonable medical judgment of a licensed medical professional: (1) The embryo or fetus is nonviable; (2) The pregnancy is ectopic; or (3) A medical emergency exists."  *Id.* § 16-2R-3(a).

66.    Article 2R also provides an exception for "an adult within the first 8 weeks of pregnancy if the pregnancy is the result of sexual assault . . . or incest," or for "a minor or an incompetent or incapacitated adult within the first 14 weeks of pregnancy if the pregnancy is the result of sexual assault . . .  or incest," provided that the pregnant person has reported the incident of sexual assault or incest to law enforcement or has obtained non-abortion care from a medical professional or in a hospital for the sexual assault or incest (or any injury resulting therefrom).  *Id.* §§ 16-2R-3(b)–(c).

67.    Article 2R further provides that any abortion performed must comply with the Care Restrictions.  *Id.* §§ 16-2R-3(f)–(g).

68.    ***First***, under West Virginia Code § 16-2R-3(f), "a surgical abortion performed or induced or attempted to be performed or induced pursuant to this section ***shall be in a hospital***, as defined in § 16-5B-1 of this code, which is licensed by the Office of Health Facility Licensure and Certification of the West Virginia Department of Health and Human Resources."  *Id.* (emphasis added).  As noted, Section 16-5B-1 in turn defines a hospital as "any institution, place, building or agency in which an accommodation of five or more beds is maintained, furnished or offered for the hospitalization of the sick or injured."  *Id.* § 16-5B-1.  In effect, the Hospitalization Requirement prohibits outpatient providers, such as WHC, from providing any procedural abortion care and limits the abortions that can be offered in the outpatient setting to medication abortion.

69.    ***Second***, under West Virginia Code § 16-2R-3(g), an "abortion performed or induced or attempted to be performed or induced shall be performed by a licensed medical professional who has West Virginia hospital privileges."  *Id.*  In effect, because under HB 302 the only abortions that can be offered in an outpatient setting, like WHC, are medication abortions, the Privileges Requirement only applies to medication abortion and restricts that care to physicians who have West Virginia hospital privileges.

70.    Article 2R provides that a physician who "knowingly and willfully performs, induces, or attempts to perform or induce an abortion, with the intent to violate the provisions of § 16-2R-3 of this code, is subject to disciplinary action by his or her applicable licensing board.  If the licensing board finds [a violation], the licensing board shall revoke [the] medical professional's license."  *Id.* § 16-2R-7.

71.     As noted, HB 302 also repealed the pre-*Roe* criminal abortion ban, which had been codified at West Virginia Code § 61-2-8, and replaced it with a scheme that makes it a crime only for certain non-physicians to knowingly and willfully provide abortion care.  *See id.* §§ 61-2-8(a)– (c).

72.     Finally, HB 302 includes a comprehensive non-severability scheme that voids Chapter 16, Article 2R, and mandates reinstatement of multiple provisions of West Virginia's prior statutory framework regulating abortion if any portion of Article 2R is declared unconstitutional.

73.     First, a non-severability clause in Article 2R itself expressly voids all of Article 2R if a court determines that any part of it is unconstitutional:  "If any provision of § 16-2R-1 *et seq.* of this code is judicially determined to be unconstitutional, ***this entire article*** shall be of no force and effect and the provisions of § 16-2F-1 *et seq.*, § 16-2I-1 *et seq.*, § 16-2M-1 *et seq.*, § 16-2O-1, § 16-2P-1, § 16-2Q-1, and § 33-42-8 of this code shall become immediately effective."  *Id.* § 16-2R-9 (emphasis added).

74.     Second, HB 302 added a number of identical provisions throughout West Virginia's prior statutory framework for regulating abortion, which explicitly resurrect each of these statutes if any of the new restrictions contained in Chapter 16, Article 2R, is found unconstitutional.  These provisions state:  "Effective from the reenactment of this section during the third extraordinary session of the Legislature, 2022, this article is of no force or effect ***unless any provision of § 16-2R-1 et seq. of this code is judicially determined to be unconstitutional***."  *Id.* §§ 16-2F-9 (parental notification), 16-2I-9 (informed consent), 16-2M-7 (stage of pregnancy), 16-2O-1(e) (abortion methods), 16-2P-1(d) (so-called "born alive" act), 16-2Q-1(m) (patient reason), 33-42-8(d) (also abortion methods) (emphasis added).

75.     Together, these provisions unambiguously reflect the Legislature's intent that if any provision of Article 2R is determined to be unconstitutional, then the entire article is of no force or effect, and §§ 16-2F-9, 16-2I-9, 16-2M-7, 16-2O-1, 16-2P-1(d), 16-2Q-1, and 33-42-8 are reinstated as the governing law.

## IV.    HB 302's Irrational Hospitalization Requirement for Procedural Abortion

76.     HB 302's requirement that all procedural abortions be provided in a hospital is unheard of in modern medicine.

77.     No other state requires that all procedural abortions during any stage of pregnancy be provided in a hospital setting.

78.     At no point between 1973, when abortion was first legalized in West Virginia in light of *Roe*, and September 2022, when HB 302 was enacted, did West Virginia law ever require procedural abortions at any stage in pregnancy be performed in a hospital.

79.     Like virtually all routine gynecological care provided today, procedural abortions are almost always provided in an outpatient setting.

80.     Procedural abortion is analogous to other gynecological procedures that take place in outpatient settings in terms of risks, invasiveness, instrumentation, and duration.

81.     For example, as noted, aspiration abortion is identical to the procedure used to manage early miscarriage after fetal or embryonic demise has occurred.  Yet, pursuant to HB 302, an aspiration procedure must be performed in a hospital if the patient is experiencing an inevitable miscarriage, but demise has not yet occurred; but the exact same procedure, with the identical risk profile, can be provided to the exact same patient in an outpatient setting if demise has occurred naturally.

18

82. As noted, early procedural abortion is also identical to certain outpatient diagnostic procedures that are used to remove tissue from the uterus for testing (though differing levels of sedation may be used).

83. Neither West Virginia nor any other state requires these or any other comparable, routine, outpatient gynecological procedures to be performed in a hospital.

84. Further, procedural abortion is *safer* than other routine gynecological procedures that also are almost always performed in an outpatient setting. For example, the insertion of an intrauterine device ("IUD"), while extremely safe, carries greater risks of uterine perforation than aspiration abortion, yet is routinely performed in-office and never needs to occur in a hospital setting.

85. Complications from procedural abortion, particularly in the first trimester, are very rare and are almost always handled in the outpatient setting.

86. Data from the last five years show that less than one half of one percent of WHC's procedural abortion patients have ever sought hospital-based care.

87. In the exceedingly rare event of a complication requiring hospital-based care, established policies and protocols ensure the patient's care is safely transferred to a hospital-based provider. These are the same policies and protocols that are followed for comparable outpatient gynecological or other procedures, as well as for those that carry greater risks.

88. There is no rational justification for singling out procedural abortion for differential treatment.

89. ACOG's guidelines for the provision of abortion care not only do not require that abortions be performed in hospitals, but they also find no basis for requiring that abortions be performed in ambulatory surgical centers, which are outpatient settings with hospital-like facilities.

90.    ACOG has strongly condemned efforts to impose more stringent requirements on abortion than on procedures carrying similar risk as lacking any sound scientific or medical basis.

91.    This has been recognized for decades.  Even in the late 1970s, it was understood in the medical community that the vast majority of abortions did not need to be performed in a hospital.  Even then, requiring all abortion to be performed in a hospital was virtually unheard of and considered medically unjustified.

92.    Although extremely uncommon, there are limited circumstances in which a procedural abortion should be performed in a hospital due to circumstances related to an individual *patient*, not the procedure itself.

93.    This is the case across all medical procedures in all areas of medicine.  There are no West Virginia laws, however, mandating that other medical procedures always be performed in a hospital, just because rare patients with preexisting conditions cannot be seen in outpatient settings.

94.    It is routine across all areas of medicine that physicians assess each patient's individual medical history and the physician's own experience and training to make an individualized determination about whether and how to proceed with care.

95.    As noted, WHC follows established protocols and guidelines for screening patients for eligibility for procedural abortion at the Center.

96.    Given the extraordinary safety profile of procedural abortions in the outpatient setting, it is unsurprising that courts have repeatedly found that there is no medical basis for requiring procedural abortions be performed in hospitals.  *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179 (1973); *City of Akron v. Akron Ctr. for Reprod. Health, Inc*., 462 U.S. 416 (1983); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476 (1983).

20

97.     As noted, the Legislature did not consider any evidence relating to the safety of procedural abortion generally, or as performed in West Virginia (almost exclusively, for the past five years, by WHC), before enacting the Hospitalization Requirement.

## V.      HB 302's Irrational Hospital Privileges Requirement

98.     Likewise, HB 302's requirement that any physician who provides abortion care have hospital privileges at a West Virginia hospital is patently illogical.  *See* W. Va. Code § 16-2R-3(g).

99.     As noted, because the Hospitalization Requirement mandates that all procedural abortions be performed in a hospital, the Privileges Requirement effectively applies only to medication abortions.

100.    Hospital privileges delineate who is a member of a hospital's staff, their responsibilities as a member of a hospital's staff, the scope of services they are permitted to provide, and the circumstances under which they are permitted to provide them, at the hospital.

101.    The criteria for exercising hospital privileges are set by each hospital and reflect both clinical and economic considerations.  For example, hospitals typically require physicians to treat or admit a sufficient number of patients to the hospital each year to justify the hospital granting the use of its resources to that particular physician.

102.    Hospitals also typically require providers with privileges to, for example, provide emergency care coverage for the hospital on a regular basis and vote on hospital governance issues.

103.    Given the nature and purpose of hospital privileges, the types of providers with hospital privileges are typically those who have a hospital-based specialty, such as surgery; those who practice in a specialty in which hospital admission is common, such as oncology or cardiology; or those who work in practices or facilities directly affiliated with the hospital itself.

21

104.    Whether a provider has hospital privileges has no bearing on whether one of their patients receives care at a hospital in the event hospital care is necessary; that patient will be cared for by emergency department physicians or staff or, if necessary, the appropriate on-call physician. If it were otherwise, hospitals would have to extend privileges to every physician working in the community, regardless of their specialty or the nature of the care they provide.  That is not how modern medicine works.

105.    Moreover, for patients who already have to travel long distances from home to obtain care, whether their provider has hospital privileges has no bearing on whether that patient receives necessary care at a hospital after the patient has returned home, because the patient is unlikely to go to a hospital where that provider has privileges anyway.

106.    It is established by medical experts that there is no justification for requiring physicians to obtain hospital privileges to provide either procedural or medication abortions.

107.    For example, in 2018, the National Academies of Sciences, Engineering, and Medicine ("NASEM"), a body composed of esteemed experts that was first established by Congress in 1863 to provide independent, objective expert analysis and advice to the nation to inform public policy, concluded based on an extensive review of existing literature and data that there is no relationship between abortion safety and hospital privileges.  Instead, requiring hospital privileges is the type of policy that "diminish[es] . . . quality care," including by reducing access to abortion care.

108.    And, in 2020, after evaluating peer-reviewed evidence and clinical guidelines addressing safe outpatient care, ACOG concluded that "mandates that abortion providers obtain hospital admitting privileges are one example of government restrictions that are not based in science, improperly regulate medical practice, and impede patients' access to quality, evidence-

based care."  This is because, in part, privileges requirements are not necessary to support continuity of care between outpatient settings and hospitals and "gaining admitting privileges is not tied to patient care and is unrelated to a clinician's competence." ACOG further found that privileges are not only medically unnecessary but, in light of the divide between hospital-based and outpatient care in modern medicine, potentially "impossible" for abortion providers to obtain. In particular, because of the fact that "abortion is one of the safest medical procedures performed in the United States," ACOG noted that it is "extremely rare" that abortion will result in complications allowing a provider to meet the minimum quota of hospital patients often required by privilege applications.

109.    To impose a privileges requirement solely on medication abortion is even more unjustified.  In fact, NASEM has determined that "[t]here is no evidence that the dispensing or taking of [medication abortion pills] requires the physical presence of a clinician" at all.

110.    A recent report from the FDA confirms that the risk of death associated with medication abortion is lower than that associated with use of penicillin or Viagra.  FDA data show that even Tylenol, which is sometimes prescribed in large doses or in combination with other prescription medications, is more lethal than medication abortion.  After reviewing drug safety data, the FDA also recently allowed the expansion of mifepristone distribution not just through a patient's health care provider, but also through retail pharmacies.[16]

111.    No law in West Virginia requires hospital privileges to prescribe any other medication, including penicillin or Viagra, notwithstanding that those medications are more lethal than medication abortion.

---

[16] Misoprostol, the second drug in the medication abortion regimen, has already been available in pharmacies for decades.

112.    As noted, other serious adverse events (*e.g.*, hospitalization, serious infection, and bleeding requiring transfusion) among medication abortion patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."

113.    Moreover, complications from medication abortion requiring hospital treatment are not only extremely rare but would only arise long after the patient has left the clinic.

114.     These extremely rare complications (*e.g.*, uncontrolled bleeding, severe infection), if they ever do arise, can be safely managed by any emergency room physician or the on-call physician, if necessary.  Such skills are the same as those needed for the treatment of spontaneous miscarriage, which are often treated in hospital emergency rooms.

115.    Sometimes medication abortion patients seek follow-up care at a local emergency room, even when their condition does not warrant hospital-based care, because they do not want to wait to make a follow-up appointment with their abortion provider and/or because they live far away from their abortion provider.  Whether and where their abortion provider has hospital privileges is irrelevant to these patients.

116.    Data for the past five years show that, in the days or weeks after a medication abortion, only four of WHC's thousands of medication abortion patients *total* sought any follow-up care at a hospital at all.  No medication abortion patient has ever been transferred from WHC to the hospital for emergency care.

117.    Of these four patients, only two went to a hospital in Charleston.

118.    Given the extraordinary safety profile of abortion in the outpatient setting, it is unsurprising that courts have repeatedly found that there is no medical basis for requiring hospital privileges to provide any outpatient abortion care at all.  *See, e.g.*, *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103 (2020); *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016).

119.    As noted, the Legislature did not consider any evidence relating to the safety of medication abortion generally, or as performed in West Virginia (almost exclusively, for the past five years, by WHC), before enacting the Privileges Requirement.

## VI.    HB 302's Irrational Care Restrictions Have Prevented Plaintiffs from Providing Essential Abortion Care

120.    Plaintiffs cannot comply with the Care Restrictions and therefore can no longer provide any abortion care.

121.    First, because WHC is not a hospital, neither WHC nor any of its physicians, including Dr. Doe, can continue to provide patients with procedural abortion at all.  Procedural abortion comprised approximately 47% of the abortions provided by WHC in 2021 and, because medication abortion is only available until 11 weeks LMP, is the only method of abortion available to patients after this point in pregnancy, or for those patients who are otherwise ineligible for a medication abortion.

122.    Second, WHC effectively cannot offer medication abortion to eligible patients either because its primary physician, Dr. Doe, does not have the requisite hospital privileges and cannot apply for them without jeopardizing his medical license and professional career.

123.    While the other physician who provides abortions at WHC has privileges at Charleston Area Medical Center ("CAMC"), his schedule only permits him to work at WHC two half-days per month, and only then if there are sufficient patients scheduled in advance to justify him taking time away from his primary practice.  Given the logistics required to ensure the patient is eligible for care and that WHC has sufficient staff to assist the physician, as a practical matter, relying on this physician to provide medication abortion means it could barely, if ever, actually provide this care to patients.

124.    Dr. Doe cannot satisfy the basic criteria for hospital privileges at CAMC, which is where emergency medical services would take a WHC patient in the exceedingly rare event of an emergency complication because, among other reasons, abortion is so safe that he could not satisfy the minimum requirements for treating patients at the hospital.

125.    Physicians are required to report any denied or even withdrawn applications for hospital privileges when they apply for and renew their medical licenses.

126.    Moreover, if a physician were accused of misrepresenting their eligibility for privileges, it could harm a physician's reputation and professional standing, or even lead to professional sanctions. *See, e.g.*, W. Va. Code § 30-3-14(c)(1) ("The [Licensing] board may deny an application for a license or other authorization to practice medicine and surgery or podiatry in this state and ***may discipline a physician*** or podiatrist licensed or otherwise lawfully practicing in this state who, after a hearing, has been adjudged by the board as unqualified due to any of the following reasons: (1) Attempting to obtain, obtaining, renewing, or attempting to renew a license or other authorization to practice medicine and surgery or podiatry by bribery, ***fraudulent misrepresentation***, or through known error of the board . . . ." (emphases added)).

127.    Thus, Dr. Doe will not apply for privileges when he could not in good faith assert that he satisfies the basic criteria for exercising those privileges.

128.    Although HB 302 could ostensibly be satisfied by hospital privileges anywhere in West Virginia, the only place where Dr. Doe actually practices medicine in West Virginia is in Charleston.

129.    Expecting, let alone requiring, a physician to obtain hospital privileges in a location where he does not practice medicine is even more irrational.

**VII.**   **HB 302 is Inflicting Irreparable Harm on Plaintiffs and Their Patients**

130.   As noted, any physician who provides procedural or medication abortions in violation of HB 302 faces automatic loss of licensure.  W. Va. Code § 16-2R-7.

131.   Accordingly, by eliminating WHC's ability to continue to provide procedural abortions and effectively eliminating its ability to continue to provide medication abortion, HB 302 is inflicting irreparable harm on the ability of WHC to fulfill its professional mission and purpose to provide reproductive health care that respects patients' choices, including the decision not to continue a pregnancy to term.

132.   By eliminating WHC's ability to continue to provide procedural abortions and effectively eliminating its ability to continue to provide medication abortion, HB 302 is also inflicting irreparable harm to WHC's finances and operations, as the elimination of abortion services and loss of related revenue has forced it to eliminate staff.

133.   By eliminating Dr. Doe's ability to continue to provide procedural and medication abortions at WHC and in West Virginia, HB 302 is likewise inflicting irreparable harm on his ability to practice his profession and to fulfill his personal and professional commitment, as a native West Virginian, to serving the reproductive and sexual health needs of West Virginians.

134.   By subjecting both WHC and Dr. Doe to irrational requirements that undermine their ability to pursue their professional mission and purpose and practice their profession, HB 302 is inflicting irreparable harm on WHC's and Dr. Doe's constitutional rights to due process and equal protection.

135.   By subjecting both WHC's and Dr. Doe's patients to irrational requirements that deprive them of their ability to obtain abortion care and permitting patients seeking comparable if not riskier procedures and medications to continue to access medical care, HB 302 is inflicting

irreparable harm on the constitutional rights to due process and equal protection of WHC's and Dr. Doe's patients.

136.    Finally, by forcing the sole abortion clinic in West Virginia to stop providing abortion services altogether, HB 302 is inflicting irreparable harm on the health, safety, and well-being of WHC's and Dr. Doe's patients and all people seeking abortions in West Virginia.

137.    Because of HB 302, people seeking abortion in West Virginia have no choice but to attempt to travel out-of-state to obtain the care they need, carry their pregnancies to term against their will, or attempt to self-manage their abortion outside the medical system.

138.    Forcing people to travel out-of-state to obtain abortion care presents significant financial and logistical challenges.  People must not only shoulder the financial costs of the procedure and travel, but also take time off of work (often without paid sick leave), school, and/or family and caregiving responsibilities, which itself can incur significant financial costs.

139.    For people with low incomes, inflexible jobs, and/or lack of childcare, this can be an especially great burden.  That is common in West Virginia:  approximately 40% of WHC's patients have Medicaid as their health insurance, though they generally cannot use Medicaid to cover the cost of the abortion.

140.    For people who live in rural areas, the distance of travel itself can present a significant, if not insurmountable, obstacle.  For victims of rape and incest, in particular, there is the additional toll on their mental health from the unnecessary stress of traveling great distances to receive care under already difficult circumstances.

141.    Moreover, the time it takes to gather the resources to pay for the abortion and related travel and other costs can lead to delay, particularly for patients with low incomes and/or who live in rural areas, which leads to increased health risks.  While abortion is always very safe, and always

safer than continuing a pregnancy to term, delays can increase the risk of complication. Delays can also result in increased costs, as later procedures are more expensive, which can make it even more difficult (if not impossible) for some patients to obtain care and can push some patients past the point in pregnancy where they can obtain a medication abortion altogether.

142.    Even people who are able to gather the resources to travel out-of-state to get care may not be able to obtain care in time. As more and more clinics like WHC are forced to close, the clinics that remain open in other states—including the out-of-state clinic where Dr. Doe provides abortion care—are flooded with increased demand that they may not have capacity to handle.

143.    Those who are unable to surmount these burdens will be forced to continue their pregnancies to term against their will. As noted, abortion is significantly safer than carrying a pregnancy to term. Indeed, the risk of death following childbirth is approximately 14 times greater than that associated with abortion. Moreover, a significant number of people who give birth vaginally have prolonged hospital admissions or re-admissions to the hospital, including for hemorrhage, infection, and other injuries. That number is even greater for patients who give birth via cesarean delivery (C-section), a major abdominal surgery that carries risks of hemorrhage, infection, and injury to internal organs. And even an uncomplicated pregnancy poses challenges to a person's entire physiology and stresses most major organs.

144.    Further, people who are denied wanted abortion care are more likely to stay in intimate partner violence situations, face bankruptcy, have lower credit scores, and have lower-income socioeconomic status.

145.    Forcing victims of rape and incest to carry to term pregnancies that were the result of their abuse inflicts additional and distinct harms. Forced pregnancy under these circumstances

ties the victim to their abuser for the rest of their life, often leading to significant and ongoing psychological, emotional, and physical trauma.

146.    In particular, WHC has provided care to minors who were groomed and raped by older people they trusted.  HB 302 could force those children to become parents against their will— sometimes, before they've even started middle school.  Young people forced into childbirth and parenting under these circumstances are less likely to complete school, seek higher education, or obtain employment.

\*       \*       \*

147.    For the reasons set forth above, HB 302's Care Restrictions are out of touch with modern medicine, lack any rational justification, and are not logically connected to any legitimate government interest and are therefore unconstitutional.

148.    Pursuant to HB 302's explicit and comprehensive non-severability clauses, this Court should declare HB 302 "of no force or effect," preliminarily and permanently enjoin its enforcement, and restore the prior statutory framework for abortion under West Virginia law, as provided by HB 302.  W. Va. Code §§ 16-2R-3(f)–(g), 16-2R-9, 16-2F-9, 16-2I-9, 16-2M-7, 16-2O-1(e), 16-2P-1(d), 16-2Q-1(m), 33-42-8(d).

### CLAIMS FOR RELIEF

### COUNT I
### Fourteenth Amendment of the U.S. Constitution
### Due Process and/or Equal Protection
### 42 U.S.C. § 1983

149.    Plaintiffs incorporate all preceding paragraphs of the Complaint as if set forth fully herein.

150.    HB 302 violates Plaintiffs' due process and/or equal protection rights by requiring them to comply with HB 302's Care Restrictions, which are not rationally related to any legitimate state interest.

151.    HB 302 violates the due process and/or equal protection rights of Plaintiffs' patients because the Care Restrictions prevent them from accessing otherwise lawful medical care and are not rationally related to any legitimate state interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court take these actions:

A.  Issue a preliminary injunction, and later a permanent injunction, restraining Defendants; their employees, agents, delegates, and successors in office; and all those acting in concert with them, from enforcing Chapter 16, Article 2R, of the West Virginia Code, or from taking any enforcement action premised on a violation of W. Va. Code § 16-2R-1 *et seq.* that occurred while such relief was in effect, or from delegating such power to take such enforcement action or to facilitate such enforcement action, and ordering that, pursuant to Section 16-2R-9 of the West Virginia Code, "the provisions of §16-2F-1 *et seq.*, §16-2I-1 *et seq.*, §16-2M-1 *et seq.*, § 16-2O-1, § 16-2P-1, § 16-2Q-1, and § 33-42-8" of the West Virginia Code are "immediately effective"; *see also* W. Va. Code § 16-2F-9; § 16-2I-9; § 16-2M-7; § 16-2O-1(e); § 16-2P-1(d); § 16-2Q-1(m); § 33-42-8(d);

B.  Enter a judgment declaring the Care Restrictions of HB 302, W. Va. Code §§ 16-2R-3(f)–(g), unconstitutional under the Fourteenth Amendment of the United States Constitution;

C.  Enter a judgment declaring that, pursuant to Section 16-2R-9 of the West Virginia Code, Chapter 16, Article 2R of the West Virginia Code is "of no force and effect," and "the provisions of § 16-2F-1 *et seq.*, § 16-2I-1 *et seq.*, § 16-2M-1 *et seq.*, § 16-2O-1, § 16-2P-1, § 16-

31

2Q-1, and § 33-42-8" of the West Virginia Code are "immediately effective." *See also id.* §§ 16-

2F-9, 16-2I-9, 16-2M-7, 16-2O-1(e), 16-2P-1(d), 16-2Q-1(m), 33-42-8(d);

     D.  Award Plaintiffs reasonable attorneys' fees and costs; and

     E.  Grant such other and further relief as the Court deems just and proper.


Dated: February 1, 2023                Respectfully submitted,


                                  /s/ *Bren J. Pomponio*

Aubrey Sparks (WVSB No. 13469)          Bren J. Pomponio (WVSB Bar No. 7774)
Nicholas Ward (WVSB No. 13703)          MOUNTAIN STATE JUSTICE, INC.
AMERICAN CIVIL LIBERTIES UNION OF WEST    1217 Quarrier Street
VIRGINIA FOUNDATION                   Charleston, WV 25301
P.O. Box 3952                        Phone: (304) 344-3144
Charleston, WV 25339-3952           bren@msjlaw.org
Phone: (914) 393-4614
asparks@acluwv.org
nward@acluwv.org

Alexa Kolbi-Molinas*                 Kathleen R. Hartnett*
Rachel Reeves*                     Kathleen Goodhart*
AMERICAN CIVIL LIBERTIES UNION       Julie Veroff*
FOUNDATION                      Reece Trevor*
125 Broad Street, 18th Floor           Darina A. Shtrakhman*
New York, NY 10004                 K.C. Jaski*
Phone: (212) 549-2633              COOLEY LLP
akolbi-molinas@aclu.org            3 Embarcadero Center, 20th Floor
rreeves@aclu.org                   San Francisco, CA 94111-4004
                                  Phone: (415) 693-2000
Alexander Robledo*                khartnett@cooley.com
COOLEY LLP                     kgoodhart@cooley.com
500 Boylston Street, 14th Floor        jveroff@cooley.com
Boston, MA 02116-3736           rtrevor@cooley.com
Phone: (617) 937-2300            dshtrakhman@cooley.com
arobledo@cooley.com              kjaski@cooley.com

                                  Marc Suskin*
                                    Patrick J. Hayden*
                                    Angeline X. Chen*
                                    Michael Paul Bannon*
                                    COOLEY LLP
                                    55 Hudson Yards

New York, NY 10001-2157
Phone: (212) 479-6000
msuskin@cooley.com
phayden@cooley.com
axchen@cooley.com
mbannon@cooley.com

*Attorneys for Plaintiffs*
*\* Statements of Visiting Attorneys Forthcoming*