THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| WOMEN'S HEALTH CENTER OF WEST VIRGINIA, *on behalf of itself, its staff, and its patients*; and DR. JOHN DOE, *on behalf of himself and his patients*,<br><br>*Plaintiffs*,<br>v.<br><br>ASHISH P. SHETH, *in his official capacity as President of the West Virginia Board of Medicine*; and MATTHEW CHRISTIANSEN, *in his official capacity as Secretary of the West Virginia Board of Medicine*,<br><br>*Defendants*. | Civil Action No. 2:23-cv-00079<br><br>Hon. |

**MOTION OF PLAINTIFF DR. JOHN DOE TO PROCEED UNDER PSEUDONYM AND FOR A PROTECTIVE ORDER**

**INTRODUCTION**

In this case, Plaintiffs—Women's Health Center of West Virginia ("WHC" or the "Center"), the sole known provider of outpatient abortion in West Virginia, and Dr. John Doe, one of the physicians who provided abortions at the Center—seek declaratory and injunctive relief against House Bill 302 ("HB 302"), which has forced Plaintiffs to stop providing abortion care altogether. Compl. ¶¶ 4–5. As explained in his accompanying declaration, Dr. Doe reasonably fears that disclosure of his identity as an abortion provider in the public realm will subject him and his family to threats, intimidation, and violence. Decl. of Dr. John Doe in Supp. of Mot. for Protective Order ("Decl.") ¶¶ 15–20. Indeed, Dr. Doe already takes multiple steps to limit the number of people who are aware of his work as an abortion provider in West Virginia. *Id.* ¶¶ 10–14. Dr. Doe's fears are grounded not only in the history of violence against abortion care providers in general, but also in the history of attacks against WHC and its staff in particular. *Id.* ¶¶ 3–9. At the same time, his commitment to his patients, and his concern about the ongoing impact of HB 302, compel him to participate in this litigation and advocate for the health and safety of his patients. *Id.* ¶ 20. Accordingly, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Local Rule 26.4(b) of the U.S. District Court for the Southern District of West Virginia, Dr. Doe respectfully moves this Court for a protective order placing his identity under seal and permitting him to proceed in this litigation using a pseudonym.

**ARGUMENT**

Although most aspects of judicial proceedings are open and transparent to the public, this Court has the discretion and authority to maintain the confidentiality of a party's identity and allow that party to proceed under a pseudonym. In determining whether the use of a pseudonym is appropriate, courts must "balanc[e] the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party." *Doe v.*

1

*Pub. Citizen,* 749 F.3d 246, 274 (4th Cir. 2014). As part of this inquiry, courts may consider a number of nonexclusive factors, known in this Circuit as the *Jacobson* factors, including:

> [W]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*James v. Jacobson,* 6 F.3d 233, 238 (4th Cir. 1993). Ultimately, however, there is "no hard and fast formula for ascertaining whether a party may sue anonymously." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981); *see also Doe v. Alger*, 317 F.R.D. 37, 39–40 (W.D. Va. 2016) ("Not all of these [*Jacobson*] factors may be relevant to a given case, and there may be others that are. . . . At bottom, then, the trial court must carefully review *all* the circumstances of [the] case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." (emphasis in original) (internal quotations and citations omitted)).

Applying these principles in abortion-related litigation, courts routinely permit parties to proceed under pseudonyms. These cases recognize that the highly charged issue of abortion presents unique risks to litigants—physicians and patients alike—that often warrant anonymity. Indeed, "abortion cases are, and always have been recognized to be, exceptional cases for anonymity purposes." *Roe v. Aware Woman Ctr. for Choice, Inc*., 253 F.3d 678, 685 n.8 (11th Cir. 2001) (reversing district court's denial of motion to litigate under a pseudonym); *see also, e.g.*, *Planned Parenthood Ark. & E. Okla. v. Jegley*, 2016 WL 7487914, at *2 (E.D. Ark. Feb. 1, 2016) (granting motion to treat identities of abortion clinic physicians as highly confidential, in light of evidence and case law showing "that physicians who provide abortions or associate with abortion providers are subject to personal and professional stigma and that they fear for their

2

personal safety and that of their families"); *In re Ashley Madison Customer Data Sec. Breach Litig.*, 2016 WL 1366616, at *3 (E.D. Mo. Apr. 6, 2016) (listing "cases involving abortion" among those that "have been deemed to involve information sufficiently sensitive and private to warrant anonymity"); *Choice, Inc. of TX v. Graham*, 226 F.R.D. 545, 548 (E.D. La. 2005) (allowing plaintiffs in abortion case, including two physicians, to proceed under pseudonym, as "they have, by filing suit, made revelations about their personal beliefs and practices which may invite a hostile reaction from the public"); *Doe v. Merten*, 219 F.R.D. 387, 392 (E.D. Va. 2004) (noting that "the types of personal intimate information justifying anonymity for litigating parties have typically involved such intimate personal matters as birth control [or] abortion"). Indeed, such motions are routinely granted in abortion litigation in West Virginia. *See, e.g.*, *Women's Health Ctr. of W. Va. v. Miller*, No. 22-C-556 (W. Va. Cir. Ct. July 1, 2022) (entering protective order to allow plaintiff Dr. John Doe to proceed under pseudonym).

Likewise here, the relevant considerations overwhelmingly weigh in favor of protecting Dr. Doe's identity and permitting him to proceed under pseudonym.

***First***, Dr. Doe seeks to "preserve privacy in a matter of sensitive and highly personal nature." *Jacobson*, 6 F.3d at 238. The abortion care that Dr. Doe provides to his patients is plainly private and sensitive for his patients: reproductive decisions such as abortion are among the most intimate decisions that people make in their lives, and some patients may tell no one that they are seeking an abortion. But this care is also highly sensitive for Dr. Doe, who avoids any public disclosure of his identity as an abortion care provider and has protected his anonymity throughout his career. Decl. ¶¶ 10–14. Among other things, Dr. Doe has ensured that abortion care is not listed as a service he provides on any of his online professional profiles, and even his colleagues at a different medical facility out-of-state do not know about the care he has provided in West

Virginia.  *Id.* ¶¶ 10–11.  Dr. Doe also took several precautions when he worked at the Center: when he drove to the Center, he wore plain clothes, hid his scrubs and any medical attire or equipment in a bag, wore a surgical mask, and ensured that he never entered the Center through the main entrance.  *Id.* ¶ 12.  And when Dr. Doe would leave the Center, he made sure that no cars were following him and made no stops until he was at least an hour away from the Center.  *Id.* ¶ 13.  On top of that, Dr. Doe has also advised his family members in West Virginia not to tell others in their community that he provided such services.  *Id.* ¶ 14.

*Second*, Dr. Doe reasonably fears retaliation if his identity were disclosed.  *Id.* ¶¶ 15–19.  Courts have repeatedly recognized "the extreme harassment and threats physicians providing abortions face."  *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 959 n.11 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015).  Throughout its history, WHC staff have experienced this animus first-hand.  In 1990, for example, a number of anti-abortion activists, including an anti-abortion extremist named James Kopp—who later murdered an abortion doctor in New York—invaded the Center and chained themselves together to try to prevent staff and patients from providing and accessing care.  Decl. ¶ 6.[1]  In 2000, another extremist stalked a WHC volunteer he believed to be a physician with the intent to shoot her, withdrawing only when the police arrived—all part of a plan to kill as many abortion care physicians as possible.  *Id.* ¶ 7.[2]  And in 2019, a WHC escort was forced to file a restraining order against another protester, who nonetheless continued to show up at the clinic.

---

[1] Esther Wang, *The Last Abortion Clinic in West Virginia*, Jezebel (Nov. 18, 2019), https://jezebel.com/the-last-abortion-clinic-in-west-virginia-1838886688.

[2] Dennis B. Roddy, *Clinic Stalker Couldn't Pull the Trigger*, Pittsburgh Post-Gazette (Mar. 12, 2000), https://old.post-gazette.com/regionstate/20000312shooter3.asp.

4

*Id.* ¶ 8.[3] Since Dr. Doe joined WHC in 2021, he has continued to see such harassment and threats at the Center: he has seen protesters armed with guns outside the Center, and protesters have harassed people who enter through the Center's main entrance, taken photos of these people and their license plates, and even livestreamed videos of the Center's patients and staff on Facebook. *Id.* ¶ 9.

Nationwide, such intimidation and violence against abortion care providers is routine and increasing. The United States Department of Justice ("DOJ") has reported numerous convictions in recent years for crimes against providers, including for throwing Molotov cocktails at clinics and sending death threats to clinic staff.[4] The DOJ reported that in 2022 alone, federal prosecutions for Freedom of Access to Clinic Entrances ("FACE") Act offenses for using intimidation tactics and blockading the entrances of clinics occurred in the District of Columbia, Chicago, Nashville, New York State, Philadelphia, Oregon, and Los Angeles.[5] In February 2022, one man in Ohio pled guilty to threatening to kill an abortion patient and bomb the clinic where she was seeking care,[6] which directly followed an arson that burned down a women's healthcare

---

[3] Wang, The Last Abortion Clinic in West Virginia, supra.

[4] U.S. Dep't of Justice, *Recent Cases on Violence Against Reproductive Health Care Providers*, https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers (last updated Oct. 18, 2022); *see also* Matt Bloom, *Clinics That Provide Abortion Services Are Increasingly Worried About Security,* NPR (July 26, 2022), https://www.npr.org/2022/07/26/1113615302/clinics-that-provide-abortion-services-are-increasingly-worried-about-security.

[5] U.S. Dep't of Justice, *Recent Cases on Violence Against Reproductive Health Care Providers*, https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers (last updated Oct. 18, 2022).

[6] U.S. Dep't of Justice, *Columbus Man Pleads Guilty to Threatening Local Reproductive Health Services Facility* (Feb. 15, 2022), https://www.justice.gov/opa/pr/columbus-man-pleads-guilty-threatening-local-reproductive-health-services-facility.

clinic in Knoxville, Tennessee.[7] The National Abortion Federation, which has compiled statistics regarding incidents of disruption and violence at abortion clinics for decades, has reported that such violence is on the rise: it found that, in 2021, twelve incidents of stalking were reported in the U.S., "which alone represents a 200% increase over 2020 reports."[8]

**Third**, Dr. Doe is not only reasonable in fearing for his own safety, but also for that of his family—*i.e.*, innocent nonparties. Most of Dr. Doe's family resides in a conservative part of West Virginia, and Dr. Doe's uncommon last name—used by his family members in West Virginia, including his grandfather and father—makes them easy targets. Decl. ¶¶ 16–17. Dr. Doe's family lives in a community in which many people are hostile to abortion, and Dr. Doe has advised them not to tell others (even their friends) that he performs abortion care out of concern for their physical safety. *Id.* ¶¶ 14, 16. While Dr. Doe is an adult, the ages of the persons whose privacy interests are sought to be protected, including members of Dr. Doe's family, span decades. Because individuals whose privacy interests are sought to be protected fall into more vulnerable populations, this factor also weighs in favor of anonymity. *See Alger*, 317 F.R.D. at 40–41. These unique and significant risks of harm weigh strongly in favor of protecting Dr. Doe's anonymity.

**Finally**, Dr. Doe challenges government actors, acting in their official capacity, and not a private party. *See id.* at 41 ("When a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing."). Allowing Dr. Doe to proceed under a pseudonym— but not otherwise shielding this case from public access—will cause no harm to the public interest.

---

[7] Carter Sherman, *A Planned Parenthood Clinic Went Up in Flames. It Was Arson,* Vice News (Jan. 7, 2022), https://www.vice.com/en/article/qjbjxm/planned-parenthood-east-tennesee-fire-arson.

[8] Nat'l Abortion Federation, *2021 Violence & Disruption Statistics* at 4 (2022), https://prochoice.org/wp-content/uploads/2021_NAF_VD_Stats_Final.pdf.

6

"Party anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them." *Stegall*, 653 F.2d at 185. That is particularly true here, as the disclosure of Dr. Doe's true name "adds very little, if anything, to the pool of public information." *June Med. Servs., LLC v. Phillips*, 2021 WL 292441, at *8 (M.D. La. Jan. 28, 2021), *aff'd in part, rev'd in part on other grounds*, 2021 WL 2153819 (M.D. La. May 27, 2021). Additionally, "there appears to be little prejudice to defendant[s] from allowing plaintiff[s] to proceed anonymously." *Doe v. Wash. Univ.*, 2019 WL 11307648, at *1 n.1 (E.D. Mo. Apr. 2, 2019). And since "the filing of an action challenging the constitutional validity of government activity generally involves no injury to the Government's reputation," *Merten*, 219 F.R.D. at 394 (internal quotations omitted), the official-capacity Defendants in this case face no reputational injury that would counsel against Dr. Doe's use of a pseudonym here. Accordingly, allowing Dr. Doe to proceed anonymously would be "an appropriately tailored means of protecting [Dr. Doe's] interests without unduly restricting public access to the litigation materials." *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 594 (E.D. Va. 2016). Against this backdrop, Dr. Doe's name is simply not material to this litigation.

In sum, given the significant privacy concerns and risks of harm to Dr. Doe, coupled with the absence of any prejudice to Defendants, Dr. Doe should be permitted to proceed under pseudonym.

## CONCLUSION

For the reasons stated herein, Plaintiff Dr. John Doe respectfully requests that the Court grant his motion for a protective order allowing Dr. Doe to proceed under pseudonym.

Dated: February 2, 2023            Respectfully submitted,

           /s/ *Bren J. Pomponio*

| | |
|---|---|
| Aubrey Sparks (WVSB No. 13469) | Bren J. Pomponio (WVSB Bar No. 7774) |
| Nicholas Ward (WVSB No. 13703) | MOUNTAIN STATE JUSTICE, INC. |
| AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA FOUNDATION | 1217 Quarrier Street |
| P.O. Box 3952 | Charleston, WV 25301 |
| Charleston, WV 25339-3952 | Phone: (304) 344-3144 |
| Phone: (914) 393-4614 | bren@msjlaw.org |
| asparks@acluwv.org | |
| nward@acluwv.org | |
| | |
| Alexa Kolbi-Molinas* | Kathleen R. Hartnett* |
| Rachel Reeves* | Kathleen Goodhart* |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION | Julie Veroff* |
| 125 Broad St., 18th Floor | Reece Trevor* |
| New York, NY 10004 | Darina A. Shtrakhman* |
| Phone: (212) 549-2633 | K.C. Jaski* |
| akolbi-molinas@aclu.org | COOLEY LLP |
| rreeves@aclu.org | 3 Embarcadero Center, 20th Floor |
| | San Francisco, CA 94111-4004 |
| | Phone: (415) 693-2000 |
| | khartnett@cooley.com |
| | kgoodhart@cooley.com |
| | jveroff@cooley.com |
| | rtrevor@cooley.com |
| | dshtrakhman@cooley.com |
| | kjaski@cooley.com |
| | |
| Alexander Robledo* | Marc Suskin* |
| COOLEY LLP | Patrick J. Hayden* |
| 500 Boylston Street, 14th Floor | Angeline X. Chen* |
| Boston, MA 02116-3736 | Michael Paul Bannon* |
| Phone: (617) 937-2300 | COOLEY LLP |
| arobledo@cooley.com | 55 Hudson Yards |
| | New York, NY 10001-2157 |
| | Phone: (212) 479-6000 |
| | msuskin@cooley.com |
| | phayden@cooley.com |
| | axchen@cooley.com |
| | mbannon@cooley.com |

*Attorneys for Plaintiffs*
*\* Statements of Visiting Attorneys Forthcoming*