# EXHIBIT 4

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| WOMEN'S HEALTH CENTER OF WEST VIRGINIA, *on behalf of itself, its staff, and its patients*; and DR. JOHN DOE, *on behalf of himself and his patients*,<br><br>*Plaintiffs*,<br>v.<br><br>ASHISH P. SHETH, *in his official capacity as President of the West Virginia Board of Medicine*; and MATTHEW CHRISTIANSEN, *in his official capacity as Secretary of the West Virginia Board of Medicine*,<br><br>*Defendants*,<br><br>and<br><br>THE STATE OF WEST VIRGINIA,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:23-cv-00079<br><br>Hon. Irene C. Berger |

**REBUTTAL DECLARATION OF MARK D. NICHOLS, M.D., IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, MARK D. NICHOLS, M.D., declare the following:

1. I submit this rebuttal declaration in further support of Plaintiffs' Motion for Preliminary Injunction and, specifically, to rebut the following claims set forth in the Declaration of Ingrid Skop, M.D., F.A.C.O.G. ("Skop Decl.") (Dkt. 38-1): (1) that the challenged law's exceptions are sufficient to ensure access to abortion for those who need it, and that its restrictions will not otherwise limit access to abortion;[1] (2) that reporting deficiencies render data on abortion-

[1] Skop Decl. ¶¶ 9–19.

related complications and maternal mortality unreliable;[2] (3) that research regarding abortion is corrupted by pervasive "pro-abortion bias," resulting in unreliable and flawed research;[3] (4) that first and second trimester abortions are unsafe because they carry high rates of complications;[4] and (5) that West Virginia's hospitalization and hospital privileges requirements for abortion are reasonable and will increase patient safety.[5]

## REBUTTAL OPINIONS

### I. Contrary to Dr. Skop's Opinion, Abortion Is Essential Healthcare, and the Challenged Law's Exceptions Will Not Ensure That People Seeking Abortion Will Have Access to the Care They Need

2. Dr. Skop's trivialization of the substantial obstacles to accessing medical care and the extensive harm to patients caused by the challenged restriction is based on flawed reasoning and underscores her lack of knowledge regarding how abortion and miscarriage care is provided in the United States today.

3. First, Dr. Skop demonstrates a misunderstanding about the provision of abortion and miscarriage care by claiming that an exception in the law for miscarriage is not necessary because "[a] miscarriage occurs when the unborn human has died," and in those circumstances, the procedure to remove the contents of a patient's uterus does not qualify as an abortion.[6] It is not the case, as Dr. Skop suggests, that in every miscarriage an embryo or fetus has already died in utero when the patient seeks care.[7] When a patient experiencing miscarriage seeks care to

---

[2] *Id*. ¶¶ 20–29.

[3] *Id.* ¶¶ 20–21, 26–27, 44–45.

[4] *Id.* ¶¶ 30–53.

[5] *Id*. ¶¶ 54–57.

[6] *Id.* ¶ 9.

[7] *Id*.

complete the process before fetal demise has occurred, the treatment that is provided is an abortion—the same medications and/or procedures are used to end the pregnancy. In my experience, this is often when patients seek care, *i.e.*, before fetal demise has occurred. Similarly, while I understand that the law has an exception for ectopic pregnancies, that does not mean that the procedure to treat an ectopic pregnancy is not an abortion; it is the termination of a pregnancy that will never be viable, and presents risks to a patient's health, but the procedure to treat it is, in fact, an abortion.

4. Second, Dr. Skop minimizes the need for abortion in cases of rape and incest and ignores the reality that requiring a person to file a police report prior to obtaining care creates a significant obstacle, as I discuss further below. Indeed, Dr. Skop inaccurately cites a Guttmacher Institute report for the proposition that only one to three percent of *all* abortion patients in the United States seek abortions in cases of rape and incest, severe fetal abnormalities, or a threat to a mother's life.[8] But the study on which Dr. Skop relies examined abortion patients' insurance coverage and method of payment in concluding that, because three percent of abortions were covered by Medicaid, those cases must have been the result of some exception, such as rape, incest, fetal abnormality, or threat to the mother, which would allow for Medicaid coverage.[9] From that observation, Dr. Skop assumes that only three percent of *all* abortions are for these reasons. Utilizing rates of limited Medicaid coverage is not an accurate measure of how many times people actually seek abortions because it fails to account for those abortions that were sought because of rape, incest, fetal abnormality, or threat to the mother's life that were paid for through other means.

---

[8] *Id.* ¶ 11.

[9] Jenna Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Institute 9 (May 2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014 (last visited Mar. 14, 2023).

Even if Dr. Skop's assertion that only a small number of patients seek abortion due to rape or incest were correct, this does not mean that those patients do not need abortion care, or that they will be able to obtain abortion under the law's exceptions.

5. Dr. Skop inappropriately assumes that if Dr. Doe is unable to provide abortion services in West Virginia, hospital OB/GYNs will be willing to provide abortion care in cases of rape because people will be sympathetic to how the patient became pregnant.[10] In my opinion, this ignores the fact that not all OB/GYNs provide abortion care in a hospital.

6. For example, not all OB/GYNs are permitted to provide abortion care in a hospital because of limitations in the hospitals' policies. In other words, an OB/GYN may be employed by a hospital that prohibits abortion or that effectively prohibits abortion by declining hospital privileges for abortion procedures. While the specific facts may vary from physician to physician, it is not the case that a patient seeking abortion could simply request and receive the care they need from their OB/GYN. Dr. Skop claims that a hospital-based provider who rarely, if ever, provides abortion care would provide safer care than Plaintiffs.[11] But abortion is already extremely safe and it defies logic to suggest that a patient would receive safer care from a hospital physician who rarely, if ever, provides abortion as compared to a healthcare provider that regularly provides abortion as part of their practice.

7. Dr. Skop also baselessly claims that reporting rape to the police "is the first step toward providing needed interventions."[12] While I agree with Dr. Skop that supportive services, resources, and counseling are necessary for patients who become pregnant as a result of incest or

---

[10] Skop Decl. ¶ 12.

[11] *Id.* ¶ 57.

[12] *Id.* ¶ 15.

other intimate partner violence, unfortunately, a police report does nothing to guarantee the provision of these services. For some patients, filing a police report is not feasible for many reasons, including the risk that it may place them in greater danger if an abuser discovers their reporting. I have cared for patients who feared that reporting their abuse to authorities would provoke their abusers to retaliate against them through additional violence and abuse. People in this situation often experience repeat episodes of abuse before they are able to file complaints with authorities. Moreover, contrary to Dr. Skop's claim that an abortion in the context of rape contributes to a person's trauma,[13] in my experience, patients who have had an abortion after experiencing sexual assault have felt relief after obtaining an abortion.

8. Third, the availability of contraception does not eliminate the need for abortion access, as Dr. Skop suggests in proposing that, if they can no longer provide abortion care, Plaintiffs should instead "focus [their] attention on preventing unintended pregnancies by providing effective contraception."[14] Even assuming that every contraception method was widely accessible and affordable for all people who can become pregnant—which it is not—every contraception method, except sterilization by hysterectomy, has some risk of failure.[15] What is more, patients seek abortion for a variety of reasons, including in cases where their pregnancy was initially intended or desired, but changed circumstances, such as developing medical conditions that threaten to impair their health or their lives or their partner becoming abusive, lead them to decide to have an abortion.

---

[13] *Id.* ¶ 14.

[14] *Id.* ¶ 13.

[15] Am. Col. of Obstetricians & Gynecologists, *Effectiveness of Birth Control Methods* (Oct. 2021), https://www.acog.org/womens-health/infographics/effectiveness-of-birth-control-methods (last visited Mar. 14, 2023).

9. Fourth, Dr. Skop further demonstrates her incomprehension regarding abortion care in asserting that, in the event of a medical emergency, the proper course of treatment is either induction of labor or a cesarean section, summarily concluding that "[i]f the pregnancy is causing a serious health concern for the mother, delivering the baby will address the underlying health issue."[16]

10. Medical emergencies can occur at any point in pregnancy, including prior to viability. Such complications involve a time-sensitive condition, such as uncontrolled bleeding or severe infection, that necessitates urgent action to safeguard the life of the pregnant patient.

11. In these circumstances, the fastest method of terminating a pregnancy is a suction procedure or D&E, which typically takes 10 to 15 minutes.[17] A D&E procedure is at least 15 to 20 minutes faster than a cesarean section, which is a significant difference in a medical emergency where each minute could be the difference between a patient's survival or death. A suction procedure takes even less time than a D&E.

12. In my experience treating hundreds of patients in the midst of such medical emergencies, we have only resorted to a cesarean in extremely rare circumstances where the cervix could not be dilated quickly enough to safely manage the emergency. Dr. Skop fails to acknowledge the fact that a cesarean is a major surgery that results in greater surgical risk and blood loss than a D&E or vaginal delivery. When trained providers are available, performing a major abdominal operation such as a cesarean section on a patient who is already experiencing a medical emergency, or forcing them to go through an induction procedure, which involves

[16] Skop Decl. ¶ 18.

[17] Nat'l Abortion Fed'n, *Abortion: What to Expect*, https://prochoice.org/patients/abortion-what-to-expect (last visited Mar. 14, 2023).

laboring—including possibly for hours—and vaginal delivery, as opposed to an abortion, is irresponsible and medically unsound.

13. As detailed in my previous declaration, the effects of medically unjustified restrictions that reduce or eliminate abortion access cause extreme and unnecessary harm to patients and needlessly put their health, safety, and lives at risk. Dr. Skop's erroneous theories about why the exceptions to the challenged laws adequately protect people's health and lives only underscore her lack of knowledge regarding the practical provision of abortion care.

## II. Dr. Skop's Assertions That the United States' Alleged Reporting Deficiencies Compromise Data on Abortion Complications and Maternal Mortality Is Baseless

14. Dr. Skop incorrectly claims that there are "known U.S. data deficiencies" regarding abortion-related complications and maternal mortality, which result in the unreliability of research and literature that establish both the safety of modern abortion methods and the safety of abortion as compared to continuing a pregnancy to term and childbirth.[18] Dr. Skop contends that official government statistics released by the Centers for Disease Control and Prevention ("CDC") concerning abortion are "known to be of poor quality,"[19] pointing only to the different numbers of abortions reported by the CDC and the Guttmacher Institute. She also asserts that the lack of mandated reporting by the federal government for abortion-related complications and deaths results in deficiencies in the data.[20] None of her conclusions have merit.

15. As a threshold matter, the differing data related to the number of abortions between the CDC and the Guttmacher Institute are simply based on methodological differences in the data collection process. The different figures do not somehow undermine the reliability of the CDC's

---

[18] Skop Decl. ¶ 20.

[19] *Id.* ¶ 21.

[20] *Id.*

official government statistics. Both data collection methods are effective and thorough and demonstrate that abortion is incredibly safe.[21]

16. For example, the CDC compiles its figures based on state and local data that are voluntarily reported to the CDC from the majority of states. The Guttmacher Institute collects data by contacting every known provider of abortion (*i.e.*, clinics, hospitals, and physicians' offices) in the United States and uses questionnaires and health department data to estimate abortion incidence for providers who do not respond.[22] As a result, the Guttmacher Institute's published abortion incidence figures are higher than the CDC's because they include data and estimates from all 50 states. But the fact that the Guttmacher Institute's data includes estimates of how many abortions are performed annually ultimately does not undermine the extent to which data from both sources consistently show that the rates of mortality and morbidity (complications other than death) for abortion are very low, as I will explain.

17. With respect to mortality, the CDC not only collects numbers of abortions performed through voluntary reporting by states, but also thoroughly tracks abortion-related deaths *through additional means*. For example, as the CDC explained:

> Since 1987, CDC has monitored abortion-related deaths through its Pregnancy Mortality Surveillance System. Sources of data for abortion-related deaths have included state vital records; media reports, including computerized searches of full text newspaper and other print media databases; and individual case reports by public health agencies, including maternal mortality review committees, health care providers and provider organizations, private citizens, and citizen groups. For each death that possibly is related to abortion, CDC requests clinical records and autopsy

[21] *See, e.g.*, Jeff Diamant and Besheer Mohamed, *What the Data Says About Abortion in the U.S.*, Pew Research Ctr. (Jan. 11, 2023), https://www.pewresearch.org/fact-tank/2023/01/11/what-the-data-says-about-abortion-in-the-u-s-2/ (last visited Mar. 14, 2023); Guttmacher Inst., *Abortion Reporting Requirements* (Feb. 1, 2023), https://www.guttmacher.org/state-policy/explore/abortion-reporting-requirements (last visited Mar. 14, 2023).

[22] *See* Diamant and Mohamed, *supra* n.21.

> reports. Two medical epidemiologists independently review these reports to determine the cause of death and whether the death was abortion related. Discrepancies are discussed and resolved by consensus. Each death is categorized by abortion type as legal induced, illegal induced, spontaneous, or unknown type.[23]

Other than abortion, there is no other procedure that I am aware of for which related mortality is so closely tracked by the CDC.

18. To further attempt to advance her unfounded claim that CDC data is unreliable, Dr. Skop criticizes a well-regarded study by Raymond and Grimes[24]—which concluded that abortion is safer than childbirth and that the risk of death for childbirth is 14 times higher than that for abortion—because it relied in part on data compiled by the CDC despite its alleged "limitations."[25] But, as discussed above, CDC data is both reliable and a sound basis from which to draw conclusions.

19. Dr. Skop also criticizes the Raymond and Grimes study for comparing abortion mortality rates with maternal mortality ratios, which she claims is a "meaningless exercise," because these numbers are non-comparable denominators, but fails to explain why she believes they are non-comparable. Respected demographers who study these outcomes routinely use the denominators that Raymond and Grimes used to assess the safety of abortion and childbirth. Dr. Skop and those she cites to support her arguments are outliers in their views regarding the appropriate denominators for such assessments.

20. With respect to abortion complications, contrary to Dr. Skop's theory, reporting in this area is in fact *more* robust than reporting of complications in other areas of medicine because

---

[23] Tara C. Jatlaoui et al., *Surveillance Summaries: Abortion Surveillance — United States, 2015*, 67 Morbidity & Mortality Weekly Rep. 1, 5 (2018).

[24] Skop Decl. ¶ 22.

[25] *Id.*

the majority of states and jurisdictions have regulations that mandate the reporting of abortion-related data.[26] This suggests that the research examining abortion complications is even *more* accurate and reliable than in other areas of medicine where data collection is less systematic and routinized. For example, in the multiple states where I have practiced, including Oregon, providers are required to report both incidences of abortion and any complications that arise to the state health department. But as far as I am aware, there is no requirement for reporting outcomes for other gynecological procedures. This means, for example, that studies that show that IUD insertion has a greater risk of complication from uterine perforation than aspiration abortion might actually be *underestimating* the risk from IUD insertion, and abortion may be even safer than estimated.

21. Dr. Skop contends that "[b]ecause most abortions are paid for privately, and women often will not disclose a prior abortion, it is impossible to link *all* abortions to subsequent complications cared for in emergency rooms or deaths occurring in the year following the abortion" (emphasis added).[27] To start, it is unreasonable to expect that researchers will be able to link all abortions to all complications and deaths. As I explain above, legal reporting requirements already ensure a systematic and thorough collection of these data.

22. Further, this assertion ignores the data we have from a 2015 study that examined billing data from a one-year period for women insured under California's Medicaid service, which covers abortion care.[28] The authors identified patients who obtained an abortion covered by California Medicaid through their policy number, including those who were treated for

[26] Katherine Kortsmit et al., *Surveillance Summaries: Abortion Surveillance — United States, 2020*, 71 Morbidity & Mortality Weekly Rep. 1, 2 (2022).

[27] Skop Decl. ¶ 23.

[28] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 177 (2015).

complications within six weeks of the abortion, either at the facility providing abortion care or an emergency department. They concluded that the rate of complication resulting from abortion was 2.11 percent, which includes both major and minor complications for all abortion methods at any point in pregnancy.[29] The majority of complications were minor.[30] For major complications, defined as necessitating hospitalization, surgery, or blood transfusion, the rate was 0.23 percent.[31] By comparison, the rate of severe complication from childbirth is 144 in 10,000, or 1.4 percent.[32] The study concluded that the "complication rate is much lower than that found during childbirth and comparable to that found in the literature, even when [emergency department] visits are included and there is no loss to follow-up."[33]

23. To further support her outlier view that abortion results in higher mortality rates than childbirth, and her claim that "pro-choice researchers in the U.S. may be understating the actual risks of abortion procedures,"[34] Dr. Skop relies on studies by Gissler et al.,[35] which linked data from the Finnish birth and abortion registries to the Finnish death certificate registry when the death occurred within one year of the birth or abortion in an attempt to establish causation.[36]

---

[29] *Id.* at 179.

[30] *Id.* at 181.

[31] *Id.* at 179–81.

[32] Ctrs. for Disease Control & Prevention, *Reproductive Health: Severe Maternal Morbidity*, https://www.cdc.gov/reproductivehealth/maternalinfanthealth/smm/rates-severe-morbidity-indicator.htm (last visited Mar. 14, 2023).

[33] Upadhyay et al., *supra* n.28, at 181. Dr. Skop attempts to discredit this study on the basis that abortion-related emergency department visits may be coded incorrectly and result in underreported abortion-related complications, but her criticism is unfounded, as discussed further below.

[34] Skop Decl. ¶ 26.

[35] *Id.* ¶ 24.

[36] *Id.* ¶¶ 23–24 & n.22.

These studies purport to show that maternal mortality following an abortion is higher than that for childbirth.[37] But none of these studies account for important factors such as individual patient characteristics and social factors, which likely differ between women who give birth and those who have an abortion.[38] As the National Academies of Sciences, Engineering, and Medicine ("NASEM") concluded, "[w]ithout robust risk adjustments for these social differences, attributing outcomes to such factors as having an abortion or not, especially when the outcomes are rare, is inappropriate," and "no clear conclusions regarding the association between abortion and long-term mortality can be drawn from these studies."[39]

24. The data used by Gissler are also over-inclusive and therefore inaccurate because, as Dr. Skop admits, they include "all-cause mortality," including homicide and accidental deaths, for which abortion cannot logically be the "cause."[40] Causation and correlation are distinct concepts. Causation exists when one factor directly causes the other, whereas a correlation exists when two factors are related, but one does not necessarily cause the other. For example, it would be inappropriate to claim that abortion "caused" a patient's death if they died in a car accident on their way home from the clinic. But that is essentially what these studies are doing when they include all-cause mortality when estimating the number of deaths *caused* by abortion, which further undermines their reliability.

[37] *Id.* ¶ 24.

[38] Nat'l Acads. of Sci., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 60, 152 (2018) ("NASEM Report").

[39] *Id.*; *see also* Suzanne Zane et al., *Abortion-Related Mortality in the United States*, 126 Obstetrics & Gynecology 258 (2015).

[40] Skop Decl. ¶ 24.

25. As additional support for her unfounded theory that the risks of abortion are understated, Dr. Skop compares the 0.6 percent complication rate reported by Ireland et al.,[41] which examined data collected from Planned Parenthood of California over the course of three years, with the 5.6 percent complication rate reported by Niinimaki et al.,[42] another study based exclusively on data from Finland.[43] However, the Niinimaki study is deeply flawed because—similar to how the Gissler study over-estimates abortion mortality by including all-cause mortality—Finnish registries improperly code any follow-up visit to a healthcare facility for any reason to be a "complication" and fail to define "incomplete abortion,"[44] resulting in data that is far from "meticulous,"[45] as Dr. Skop claims. In fact, in response to this very criticism, the authors of the study conceded that because "the study is registry based, not a randomized study with strict protocols and definitions," "many of the 'complications' are not really such," and the "[r]ate of serious, 'real' complications is rare."[46] As such, the study's own authors have admitted that their conclusions regarding the rate of abortion-related complication are highly unreliable, which explains why it is contrary to the vast majority of literature assessing abortion-related complications.

26. With respect to the risks associated with medication abortion, in particular, the Niinimaki study also cannot be relied upon to draw conclusions about abortion safety in the United

[41] Luu D. Ireland et al., *Medical Compared with Surgical Abortion for Effective Pregnancy Termination in the First Trimester*, 126 Obstetrics & Gynecology 22, 22 (2015).

[42] Maarit Niinimaki et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstetrics & Gynecology 795, 797 (2009).

[43] Skop Decl. ¶ 26.

[44] Mary Fjerstad et al., *Letters to the Editor*, 115 Obstetrics & Gynecology 660, 660 (2010).

[45] Skop Decl. ¶ 26.

[46] Fjerstad, *supra* n.44, at 660.

States because it included medication abortion regimens that have never been used in the United States.[47] This underscores one of the many reasons why Dr. Skop's overreliance on studies from Finland are inapt for assessing abortion safety in the United States.[48]

27. In sum, comprehensive data and research establishing that abortion is extremely safe and much safer than childbirth demonstrate that restrictions requiring hospital and admitting privileges are unnecessary and unrelated to the low risk posed by abortion. Dr. Skop's contentions to the contrary ignore the overwhelming weight of reliable data and high-quality literature, which calls into question the reliability of her opinion.

## III. Dr. Skop's Accusation That the Wide Body of Medical and Scientific Evidence Establishing the Safety of Abortion Is Based on Bias and Corruption Is Unfounded

28. Despite the consensus of major mainstream medical organizations—such as NASEM, the American College of Obstetricians and Gynecologists ("ACOG"), and the CDC—that abortion is extremely safe and always safer than continuing a pregnancy to term, Dr. Skop asserts that "abortion advocates" intentionally obscure the dangers of abortion by funding studies that advance the narrative of abortion safety and perpetuate "pro-abortion bias."[49]

29. In particular, Dr. Skop alleges that NASEM is biased and corrupt in an attempt to discredit NASEM's highly regarded 2018 publication, *The Safety and Quality of Abortion Care in the United States* ("NASEM Report").[50] This report, which is a systematic review of the most rigorous existing literature, concluded that all methods of abortion are among the safest medical

[47] Niinimaki, *supra* n.42.

[48] Skop Decl. ¶¶ 48–49.

[49] *Id.* ¶ 27.

[50] *Id.* ¶¶ 27–29; NASEM Report, *supra* n.38.

procedures or treatments provided in the United States with a lower mortality rate than other common medical procedures and events, including childbirth.[51]

30. Though Dr. Skop dismisses the report as the work of an unethical organization colluding with pro-abortion advocates, this criticism is without merit. In fact, NASEM is an esteemed organization comprising the National Academy of Science (which was founded by Congress in 1864), the National Academy of Engineering, and the National Academy of Medicine "to provide independent, objective analysis and advice to the nation and conduct other activities to solve complex problems and inform public policy decisions."[52] Its members are elected by their peers for outstanding contributions to research, engineering, medicine, and health.[53] The Committee on Reproductive Health Services, which authored the report, is primarily comprised of professors and researchers in health and medicine from throughout the country, including Colorado, Georgia, Minnesota, Michigan, North Carolina, and Pennsylvania.[54] The NASEM Report is a Consensus Study Report, which means that it was independently reviewed by "individuals chosen for their diverse perspectives and technical expertise" to ensure that it met "institutional standards for quality, objectivity, evidence, and responsiveness to the study charge."[55]

[51] NASEM Report at 77 ("[t]he clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective"); *id.* at 75.

[52] *Id.* at iii.

[53] *Id.*

[54] *Id.* at v.

[55] *Id.* at vii.

31. The only source Dr. Skop cites for her bold claim that NASEM is tainted by "pro-abortion bias" is a piece by an anti-abortion advocacy organization, National Right to Life,[56] which speculates about possible profit motives of NASEM's funders.[57] But Dr. Skop does not offer any evidence to support her claim that the results of the study were influenced by its funders. Dr. Skop also claims that the NASEM Report was "commissioned" by its funders but offers no evidence of this, either.[58]

32. Dr. Skop further asserts that, in conducting their comprehensive literature review, the authors of the NASEM Report discriminatorily applied "stringent criteria" to exclude an "extraordinary number of studies for perceived defects," resulting in skewed conclusions.[59] Dr. Skop does not claim that the criteria NASEM applied to exclude these studies from consideration was academically or scientifically inappropriate. Rather, she assumes without explanation that if lower quality studies had been included in NASEM's review, it would have reached a different conclusion about the safety of abortion. But as anyone who conducts and publishes scientific and medical research knows, exclusion of poorly designed or otherwise flawed studies is both necessary and appropriate in order to ensure the reliability of the results and eliminate the very bias Dr. Skop alleges.

---

[56] Carole Novielli, *Study Claiming Abortion Is Safe Was Funded by Those Who Profit from It, and the Media Fails to Investigate*, NRL News Today (Aug. 5, 2019), https://www.nationalrighttolifenews.org/2019/08/study-claiming-abortion-is-safe-was-funded-by-those-who-profit-from-it-and-the-media-fails-to-investigate/ (last visited Mar. 15, 2023).

[57] Skop Decl. ¶ 27 & n.27.

[58] *Id.* ¶ 27.

[59] *Id.* ¶¶ 27–28.

33. For example, Dr. Skop complains that NASEM excluded studies that show an increased risk of mental health disorders after abortion.[60] But these "studies" showing such a link have been discredited. As the NASEM authors explained, reliable research on the relationship between abortion and mental health demands that "the study . . . control for women's mental health status at baseline (i.e., before they have the abortion)," "because women who have an abortion report higher rates of mental health disorders before undergoing the procedure compared with women who give birth."[61] NASEM therefore excluded from review those studies that "failed to control adequately for preexisting mental disorders."[62]

34. Similarly, reliable research must adequately account for the reason for an abortion, because, for example, abortions "due to fetal abnormalities may have very different psychological consequences than abortions for unwanted pregnancies."[63] NASEM therefore excluded from review those studies that "were unable to control for a woman's reason for having an abortion and whether the pregnancy was unwanted."[64]

35. By excluding lower quality studies, the report therefore ensured that its conclusions about the relationship between abortion and mental health disorders were based on the most rigorous studies available. Not surprisingly, NASEM's report concluded that abortion does not have a negative impact on women's mental health, which aligns with the conclusions of other robust scientific reviews of the literature conducted by trusted medical authorities such as the

---

[60] *Id.* ¶ 28.

[61] NASEM Report at 132.

[62] *Id.* at 150.

[63] *Id.*

[64] *Id.*

American Psychological Association ("APA") and the Royal College of Psychiatrists in the United Kingdom.[65]

36. Dr. Skop also complains that NASEM excluded studies showing a correlation between abortion and breast cancer.[66] But after an in-depth review of the literature, NASEM determined that much of it was "flawed by recall bias and lack of controls for such clinically important confounding factors as age at first live birth," which rendered it unfit for inclusion.[67] NASEM's conclusion on this point is consistent with other major medical organizations, such as the American Cancer Society, which determined that "scientific research studies have not found a cause-and-effect relationship between abortion and breast cancer."[68]

37. Dr. Skop similarly criticizes NASEM for excluding studies examining the relation between preterm birth and abortion.[69] However, in addressing preterm birth, NASEM noted that first births are at greater risk of preterm delivery than subsequent births and emphasized the importance of taking into account whether a birth is a first or subsequent one, because failure to

[65] NASEM Report at 149–52; Brenda Major et al., *Report of the APA Task Force on Mental Health and Abortion*, Am. Psych. Ass'n 5 (2008) (hereinafter "APA Task Force Report 2008"); Brenda Major et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 Am. Psych. 863, 863–64 (2009) (update to APA Task Force Report 2008, which included a review of six additional studies that met inclusion criteria but that were published after the completion of the 2008 Report); Nat'l Collaborating Ctr. for Mental Health, *Induced Abortion and Mental Health: A Systematic Review of the Mental Health Outcomes of Induced Abortion, Including Their Prevalence and Associated Factors* (2011), https://www.aomrc.org.uk/wp-content/uploads/2016/05/Induced_Abortion_Mental_Health_1211.pdf (last visited Mar. 14, 2023).

[66] Skop Decl. ¶ 28.

[67] NASEM Report at 148.

[68] Am. Cancer Soc'y, *Abortion and Breast Cancer Risk*, Cancer.org (June 19, 2014), https://www.cancer.org/healthy/cancer-causes/medical-treatments/abortion-and-breast-cancer-risk.html (last visited Mar. 15, 2023).

[69] Skop Decl. ¶ 28.

account for this factor would lead to biased results.[70] Studies that failed to do so were rightly excluded.

38. Dr. Skop's suggestion of bias is even more baseless when one considers the fact that NASEM excluded studies even when they showed *no* negative outcomes associated with abortion if they did not meet the rigorous inclusion criteria. For example, while NASEM explained that, although "several literature reviews have concluded that abortion is not associated with increased risk of ectopic pregnancy . . . , all the published reviews are methodologically flawed," and they were therefore excluded.[71] Dr. Skop's own report seems to recognize that over a dozen studies reporting no connection between abortion and breast cancer were nevertheless excluded from NASEM's review.[72]

39. Finally, to the extent that Dr. Skop suggests that highly regarded research and publications issued by the Guttmacher Institute cannot be trusted because the Guttmacher Institute is "aligned with the abortion industry,"[73] these criticisms have been widely discredited. For example, it has been well-documented that "[w]hile the Guttmacher Institute supports abortion rights, its empirical data on abortions in the U.S. has been widely cited by groups and publications across the political spectrum, including by a number of those that disagree with its positions."[74]

---

[70] NASEM Report at 139.

[71] *Id.* at 134.

[72] Skop Decl. ¶ 28.

[73] *Id.* ¶ 21.

[74] *See* Diamant and Mohamed, *supra* n.21, citing the use of Guttmacher data in publications such as *National Review* and *First Things*, a publication of the Institute on Religion and Public Life.

Indeed, Dr. Skop herself relies on Guttmacher Institute data elsewhere in her declaration to support her positions.[75]

## IV. Contrary to Dr. Skop's Assertions, Reliable Research and Data Demonstrate That First and Second Trimester Abortions Are Extremely Safe

40. I strongly disagree with Dr. Skop's claims regarding the risks associated with abortion. As detailed in my initial declaration, first and early second trimester abortions—which I understand are the only abortions that were provided in West Virginia's sole abortion clinic prior to the ban—are extremely safe.[76] Both procedural and medication abortion are highly effective with low complication rates.[77] As ACOG—another source that Dr. Skop relies on throughout her declaration—has concluded, approximately two percent of patients who undergo abortion experience a complication, with the majority of those complications being minor and able to be addressed through follow-up treatment.[78]

### A. First Trimester and Early Second Trimester Abortions

#### 1. Procedural Abortion in the First and Early Second Trimester

41. Contrary to Dr. Skop's attempt to paint procedural abortion as dangerous,[79] as I discussed in my prior declaration, first trimester treatment and procedures are among the most effective and least complicated forms of abortion. Aspiration abortion can be performed in the first and early second trimester, and less than one percent of patients experience serious

---

[75] *See, e.g*, Skop Decl. ¶ 11.

[76] NASEM Report at 10.

[77] *See* Ireland et al., *supra* n.41.

[78] Am. Col. of Obstetricians & Gynecologists, *Abortion Access Fact Sheet*, https://www.acog.org/advocacy/abortion-is-essential/come-prepared/abortion-access-fact-sheet (last visited Mar. 14, 2023).

[79] Skop Decl. ¶¶ 30–32.

complications.[80] Although there are risks associated with procedural abortion, as discussed in my initial declaration, the likelihood of risks occurring is very low and there are fewer risks than with other procedures performed in an office setting. While Dr. Skop is correct that the risk of mortality from an abortion increases with each week of gestation,[81] the important conclusion from that fact is that unnecessary delays in accessing abortion are harmful to a patient's health. Moreover, even though the risk increases as the pregnancy progresses, abortion is extremely safe, and the overall risk of mortality is vanishingly low, as explained in this declaration and my prior declaration. Furthermore, in the period during which Plaintiffs provided abortion care—in first trimester and early second trimester—the mortality risk is much lower than the risk associated with childbirth.[82]

**2. Medication Abortion Counseling and Experience**

42. Dr. Skop further states that "[t]he experience of a medical abortion is a poor one for most women," and "[t]here is nothing comfortable about self-managing one's abortion at home."[83] However, this paternalistic approach to the practice of medicine presumes a patient's inability to make informed medical decisions for themselves. The ethical practice of medicine requires the provision of information regarding all available treatment options and a steadfast respect for patient autonomy—a principle that Dr. Skop clearly neglects in assuming what is best or most comfortable for patients. Moreover, Dr. Skop cites nothing to support her disparagement of the medication abortion experience—and it cannot be based on her experience because she does not perform abortions.

---

[80] NASEM Report at 59–60.

[81] Skop Decl. ¶ 36.

[82] Linda Bartlett et al., *Risk Factors for Legal Induced Abortion Related Mortality in the United States*, 103 Obstetrics & Gynecology 729 (2004).

[83] Skop Decl. ¶ 41.

43. In practice, upon a patient's decision that they wish to terminate their pregnancy, they are typically counseled on the advantages and disadvantages of both medication and procedural abortion and are given the option of choosing which procedure they prefer. As discussed in my prior declaration, research shows that patients who choose medication abortion over procedural abortion do so for a variety of reasons, including to avoid having instruments inserted into their uterus.[84] Patients who decide to have a medication abortion instead of a procedural abortion are generally satisfied with their decision.[85]

**3. Efficacy of Medication Abortion**

44. Despite Dr. Skop's attempt to cast doubt on the efficacy of medication abortion,[86] it is highly effective, as Dr. Skop noted in citing the 98.1 percent success rate for medication abortions before seven weeks gestation.[87] Even up to ten weeks gestation, the success rate remains very high at 97.4 percent.[88] All medication abortion patients are counseled about the possibility that they may fall within the less than three percent of patients who require a follow-up procedure. The majority of these patients require an aspiration procedure because their uterus has not fully expelled its contents following the medication. Fewer than one percent of these patients require an aspiration procedure because the medication has not successfully terminated the pregnancy because there has not been embryonic demise.

---

[84] Nichols Decl. ¶¶ 22–23.

[85] Christina Rørbye et al., *Medical Versus Surgical Abortion: Comparing Satisfaction and Potential Confounders in a Partly Randomized* Study, 20 Hum. Reprod. 834, 834 (2005).

[86] Skop Decl. ¶¶ 42, 44-45, 51.

[87] *Id.* ¶ 42.

[88] Mifeprex (Package Insert), Danco Laboratories, LLC, at 13 (Jan. 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s025Lbl.pdf (last visited Mar. 15, 2023) (hereinafter "Mifeprex (Package Insert)").

**B. Safety of Medication Abortion**

45. Dr. Skop also attempts to undermine the safety of medication abortion, contending that medication abortion "frequently" leads to more serious complications, which is a gross overstatement.[89] As iterated in my initial declaration, serious adverse events from medication abortion, including hemorrhage and infection, are exceedingly rare, occurring in only a fraction of one percent of patients—a fact that Dr. Skop ignores in favor of inaccurate hyperbole, as discussed below.[90]

46. To start, in order to understand statistics on the safety of medication abortion, it is important to recognize the different potential outcomes of medication abortion. Side effects, follow-up care, minor adverse events, and serious adverse events are all distinct. A known side effect of medication abortion, such as cramping and bleeding, is expected and necessary for the medication to cause expulsion of the pregnancy, and therefore is not considered a complication or adverse event in clinical studies.

47. The distinction between an adverse event and a serious adverse event is significant. The FDA defines an adverse event as "any undesirable experience associated with the use of a medical product in a patient," whether or not a causal relationship is established between the symptom and the medication.[91] Many types of adverse events are extremely minor; for example, a headache that develops several hours after taking an over-the-counter drug could be accurately categorized as an adverse event.

---

[89] Skop Decl. ¶ 43.

[90] Nichols Decl. ¶¶ 43–46; NASEM Report at 55.

[91] U.S. Food & Drug Admin., *What Is a Serious Adverse Event?* (Feb. 1, 2016), https://www.fda.gov/safety/reporting-serious-problems-fda/what-serious-adverse-event (last visited Mar. 14, 2023).

48. A small fraction of patients may require non-emergency follow-up care, most often because the pregnancy has been terminated but the uterus has retained some tissue (referred to as an "incomplete abortion") or because the treatment regimen was not effective in terminating the pregnancy (often referred to as "ongoing pregnancy"). In these circumstances, as discussed above, the patient may need a follow up aspiration procedure to remove the remaining tissue or terminate the pregnancy. For some patients experiencing incomplete abortion, additional medication can be provided instead of a procedure. Both types of follow-up care can be managed in an office or clinic and do not require care in a hospital setting.

49. As for minor adverse events following a medication abortion, Dr. Skop misstates the frequency of this category, relying on a publication from the United States Government Accountability Office to assert that "[m]ost" patients will experience "nausea, vomiting, fever, chills, headache, diarrhea, and dizziness," although that document actually states that these are "common" symptoms and makes no mention of the proportion of patients who experience them.[92] Indeed, the package insert for mifepristone provides data showing that most of these side effects *may* occur in less than half of mifepristone patients.[93] Most importantly, none of these effects are sufficiently serious to warrant a requirement that medication abortion providers maintain hospital privileges in order to treat them.

50. To assess the relevance of a hospital privileges requirement to provide medication abortion, the relevant inquiry is whether medication abortion causes *serious* adverse events, which are defined as deaths or events that are life-threatening, cause disability, or require

[92] Skop Decl. ¶ 41; *see also* U.S. Gov't Accountability Off., *Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts* 17 (Mar. 2018), https://www.gao.gov/assets/gao-18-292.pdf (last visited Mar. 14, 2023).

[93] Mifeprex (Package Insert) at 7.

hospitalization.[94] Contrary to Dr. Skop's extrapolations,[95] and as I explained in my opening declaration, according to the FDA, serious adverse events following medication abortion—including death, hospitalization, serious infection, and bleeding requiring transfusion—among mifepristone patients are "exceedingly rare, generally far below 0.1% for any individual adverse event."[96] Dr. Skop also notes that surgical completion after medication abortion "may be as high as thirty-eight percent when medical abortion is performed in the second trimester"[97] but fails to note that, while medication abortion is used in the second trimester in other countries, it is rarely used in the United States. And Dr. Skop's assertion that a suction procedure "magnifies" the risk of medication abortion[98] misunderstands how abortion-related complications are assessed; the data demonstrating the safety of medication abortion include all outcomes, including when a suction aspiration procedure is performed. The performance of a suction aspiration is, therefore, not considered an additional risk factor of medication abortion.

51. Dr. Skop also renews her meritless claims regarding poor-quality data and bias underlying studies reporting low complication rates for medication abortion in asserting that a "large number of women [are] lost to follow-up, in which the incidence of complications is unknown," and that "many women are surprised to experience a complication when they have

---

[94] *What Is A Serious Adverse Event?*, *supra* n.91.

[95] Skop Decl. ¶¶ 41, 43–49.

[96] Nichols Decl. ¶ 45 (citing U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Rsch., *Application Number 020687Orig1s020: Medical Reviews* 38 (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf (hereinafter "Mifeprex Medical Review")).

[97] Skop Decl. ¶ 49.

[98] *Id.*

been reassured by the abortion provider that complications almost never occur."[99] However, she provides no evidence for this statement while ignoring high-quality research to the contrary.

52. Dr. Skop's suggestion that complications related to medication abortion are underreported to the FDA demonstrates her unfamiliarity with the FDA's regulation of medication abortion and how it monitors prescription drug safety more broadly.[100] Dr. Skop relies on a study authored by two anti-abortion activists for her opinion that the FDA's data on adverse events associated with mifepristone is suspect. But that study looked only at adverse events reported through the FDA's Adverse Event Reporting System. It ignores that for 15 years—from mifepristone's approval in 2000 until March 2016—the FDA specifically required that all mifepristone prescribers comprehensively report any serious adverse events associated with mifepristone to the drug manufacturer, and the manufacturer was then required to report all such events to the FDA. This mandatory reporting, imposed as part of the FDA's Risk Evaluation and Mitigation Strategy ("REMS") for mifepristone, included any hospitalizations, transfusions, serious infections, death, or "[o]ther serious and unexpected adverse events" associated with mifepristone, as well as ongoing pregnancies.[101] In 2016, the FDA's scientific review team lifted the REMS requirement that all serious adverse events associated with mifepristone be specially reported, explaining that the "FDA has received such reports for 15 years, and it has determined that the safety profile of Mifeprex is well-characterized, that no new safety concerns have arisen in recent years, and that the known serious risks occur rarely."[102] And, after reviewing those 15

[99] *Id.* ¶ 44.

[100] *Id.* ¶ 46.

[101] U.S. Food & Drug Admin., Ctr. for Drug Evaluation & Research, *Application Number 020687Orig1s020: Risk Assessment and Risk Mitigation Review(s)* 10 (Mar. 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RiskR.pdf.

[102] Mifeprex Medical Review, *supra* n.96, at 8.

years of comprehensive data, the FDA concluded that serious adverse events associated with mifepristone are "exceedingly rare."[103] In other words, the FDA's rigorous data collection for mifepristone far exceeds its data collection for most prescription drugs and aligns with the extensive body of high-quality research confirming that mifepristone is extremely safe.

53. Dr. Skop again disregards the importance of precision in how different studies define different types of adverse events when she suggests that a study of medication abortion at Planned Parenthood clinics casts further suspicion on FDA medication abortion data.[104] The 2013 *Obstetrics & Gynecology* study she references examined medication abortion data collected from Planned Parenthood clinics over a two-year period and tracked "six clinically significant adverse events (hospital admission, blood transfusion, emergency department treatment, intravenous antibiotics administration, infection, and death) and two significant outcomes (ongoing pregnancy and ectopic pregnancy diagnosed after medical abortion treatment was initiated)."[105] In other words, this study examined a broader range of "serious adverse events" as defined by the FDA, such as ongoing pregnancy and ectopic pregnancy, which, as I have discussed, are not complications in and of themselves. And while Dr. Skop emphasizes that 1,530 significant events or outcomes occurred, these accounted for only 0.65 percent of cases. Even though the study included a broader array of outcomes and events, it still concluded that these events are extremely rare, which is consistent with the extremely low rate of adverse events that the FDA reports.

---

[103] *Id.* at 47.

[104] Skop Decl. ¶ 47.

[105] Kelly Cleland et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 Obstetrics & Gynecology 166, 166 (2013).

54. Dr. Skop also baselessly asserts that mifepristone use increases the risk of infection, including *C*lostridium sordellii infection, "which has led to deaths."[106] But Dr. Skop fails to mention that no causal relationship between the medication abortion regimen and infection and death has been established.[107] *Clostridium sordellii* infection refers to a series of rare but severe and potentially fatal infections that arose in the early 2000s as a result of infection with a bacterial organism that has been associated with severe infection and death in other settings, including childbirth, miscarriage, and orthopedics cases (*e.g.*, in infections following a compound bone fracture). Following the series of infections, multiple researchers conducted rigorous research into the infection and its source. This research indicates that medication abortion did not cause the infection but instead was a result of the organism's presence in the vagina prior to abortion. Notably, when mifepristone has been used in other settings outside of the abortion and miscarriage context, including as treatment for the hormonal disorder Cushing's Syndrome, no such infections have been noted.[108] Moreover, to my knowledge, no *Clostridium sordellii* infection has been reported for years, suggesting that the organism is no longer in the environment and therefore no longer an imminent concern.[109]

55. Dr. Skop also cites an experiment in which rats that were given mifepristone exhibited signs of "animal proxies for depression and anxiety."[110] She does not otherwise explain the significance of an animal study in the context of medication abortion risks for humans.

[106] Skop Decl. ¶ 43.

[107] Mifeprex (Package Insert) at 5.

[108] Beverly Winikoff, *Clostridium sordellii Infection in Medical Abortion*, 43 Clinical Infectious Diseases 1447 (2006).

[109] *Id.*

[110] Skop Decl. ¶ 43.

Assuming that Dr. Skop is suggesting that this model is somehow instructive to assessing the risks of medication abortion to a human's mental health, this conjecture is so speculative as to be meaningless. In fact, as discussed above, high-quality studies conducted with *human* subjects make abundantly clear that abortion is not associated with adverse mental health outcomes, but that being denied an abortion can cause such outcomes.[111] Based on this human research, the APA and other prestigious medical organizations have long concluded that abortion does not cause mental health issues.[112]

56. Dr. Skop also critiques high-quality, peer reviewed literature that I discuss above, finding that emergency department visits following abortion, including medication abortion, are rare. In attempting to do so, Dr. Skop asserts that the study's methodology, which analyzes uniform national codes used to track the reason for emergency department visits, is often incorrect.[113] In my experience, the complexity of the coding system can lead to occasional errors. Nevertheless, the Upadhyay, et al. study is among the highest quality research and is very reliable.

57. Dr. Skop's assertion that emergency complications following medication abortion may be managed by clinicians other than the abortion provider[114] proves nothing about medication

[111] Nat'l Collaborating Ctr. for Mental Health, *supra* n.65, at 123–24; Trine Munk-Olsen et al., *Induced First-Trimester Abortion and Risk of Mental Disorder*, 364 New Eng. J. Med. 332 (2011); Julia R. Steinberg et al, *Abortion and Mental Health: Findings from the National Comorbidity Survey*, 123 Obstetrics & Gynecology 263 (2014).

[112] Brenda Major et al., *Report of the APA Task Force on Mental Health and Abortion*, Am. Psych. Ass'n 5 (2008); Brenda Major et al., *Abortion and Mental Health: Evaluating the Evidence*, 64 Am. Psych. 863 (2009) (update to APA Task Force Report 2008, which included a review of six additional studies that met inclusion criteria but that were published after the completion of the 2008 Report); NASEM Report; Nat'l Collaborating Ctr. for Mental Health, *Induced Abortion and Mental Health: A Systematic Review of the Mental Health Outcomes of Induced Abortion, Including Their Prevalence and Associated Factors* (2011).

[113] Skop Decl. ¶ 45 (citing Ushma D. Upadhyay et al., *supra* n.28).

[114] Skop Decl. ¶ 45.

abortion safety. In the event of a rare complication requiring urgent or emergency care, clinicians are equipped to manage complications from medication abortion because they are the same as treating complications from miscarriage. There is simply no justification for requiring hospitalization or hospital privileges to treat all patients because a patient in a rare case may need to seek emergency care from another provider.

58. Furthermore, Dr. Skop points to the removal of the REMS in-person prescribing requirements to erroneously suggest another risk of medication abortion.[115] For example, Dr. Skop claims that this will allow telemedicine prescription of medication abortion, but, setting aside the decades of research establishing the safety of using telemedicine for prescribing these medications, it is my understanding that telemedicine for abortion is prohibited in West Virginia.

59. Dr. Skop also claims that "providing medical abortion pills without first ruling out an ectopic pregnancy by ultrasound is likely to lead to more maternal deaths."[116] But her preoccupation with ectopic pregnancies in the context of medication abortion is unfounded. Ectopic pregnancy can be diagnosed through ultrasound *or* through a patient's reporting of symptoms to their physician. All abortion patients are screened for ectopic pregnancy, and if a patient is diagnosed with an ectopic pregnancy, medication abortion is not prescribed. Reliable research demonstrates that the incidence of ectopic pregnancy diagnosis following medication abortion is exceedingly low (0.02 percent), indicating that pretreatment screening methods are

[115] *Id.* ¶¶ 50–52.

[116] *Id.* ¶ 53.

highly successful.[117] Further, there is no evidence to suggest that medication abortion treatment leads to unusual complications for women with ectopic pregnancies.[118]

60. To advance her erroneous opinion that medication abortion can cause serious complications when there is an ectopic pregnancy, Dr. Skop asserts that "[i]t has been documented that a woman is 30% more likely to die from a ruptured ectopic while seeking medical abortion if it remains undiagnosed, because she may interpret the warning signs of pain and bleeding as signs the medical abortion pills are working rather than a warning sign that her life is in danger."[119] However, to support this claim, Dr. Skop cites a study that relies on data from abortions that occurred between 1972 and 1985, which was many years before medication abortion was used in the United States, rendering it inapt.[120] With the wide availability of sensitive pregnancy tests and office ultrasounds, which was not the case between 1972 and 1985, ectopic pregnancies are now diagnosed and treated earlier and rarely lead to death.

**C. Dilation & Evacuation Abortion**

61. While it is my understanding that West Virginia's sole abortion clinic did not perform D&E abortions, it is still worth noting that Dr. Skop's testimony misstates the risk of D&E abortion, further indicating her lack of knowledge regarding abortion care.

62. Dr. Skop relies on multiple outdated and inapt studies to indicate that D&E abortion carries a high complication rate, including reliance on a study evaluating abortions performed

---

[117] Caitlin Shannon et al., *Ectopic Pregnancy & Medical Abortion*, 104 Obstetrics & Gynecology 161, 161 (2004).

[118] *Id.* Although the FDA lists ectopic pregnancies as a contraindication to the administration of mifepristone and patients with ectopic pregnancies will require additional care, this does not necessitate the requirement of hospital privileges, which are unrelated to the diagnosis of ectopic pregnancies.

[119] Skop Decl. ¶ 53.

[120] *Id.*

between 1972 and 1981; a study evaluating the risks of induction abortion, which is an entirely different abortion method; and a study relying on providers' retrospective estimates of patients' blood loss, which is a notoriously inaccurate and problematic study design.[121]

63. Dr. Skop notes the complications that "may" occur in a D&E abortion but fails to mention that, overall, D&E, like all forms of abortion, is an extremely safe procedure that carries a very low risk of complication.[122]

## V. Hospital and Admitting Privileges Are Unreasonable and Unnecessary Because Abortion Is Extremely Safe in All Forms

64. A robust body of high-quality data and literature demonstrate that abortion is extremely safe, and that complications, including serious complications warranting hospital care, are rare. It is illogical to require that abortion be performed in a hospital or that abortion providers maintain hospital privileges when there is no evidence to indicate that these restrictions result in increased patient safety.

65. Dr. Skop provides no reliable data or studies to support her position and instead mischaracterizes research, draws from inapt examples, and provides statements without support when, in fact, there is no research showing that hospitalization or hospital privileges are reasonable measures to support abortion patient safety. Rather than enhancing patient safety, restrictions that make abortion harder or impossible to access cause harm to patients.

66. Dr. Skop asserts that requiring hospitalization for abortion care and hospital privileges for abortion providers protects patients from receiving substandard care by ensuring that providers are supervised by hospitals and hospital accreditation organizations like the Joint

---

[121] *Id.* ¶ 37; *see, e.g.*, *id.* at n.41, 44.

[122] NASEM Report at 63.

Commission.[123] But, as discussed in my first declaration, there is already a comprehensive oversight regime that ensures providers are credentialed and offer high-quality care, without hospital-specific oversight. State medical or professional licensing boards closely assess provider eligibility for a state medical license, including an investigation into previous malpractice or disciplinary actions, and providers are subject to formal disciplinary proceedings if they violate medical board guidelines. There is no reason that hospital-specific oversight is necessary or even relevant to ensuring high-quality patient care in the outpatient setting when other professional oversight is in place.

67. Furthermore, I understand that the Defendants in this case have claimed that "the Legislature may rationally believe that hospitals are better equipped to handle nonviable or ectopic pregnancies and/or medical emergencies" and that "these now-legal abortions can be provided more safely in the hospital setting given that some pre-existing malady to the mother or fetus must be present."[124]

68. As to ectopic pregnancies, in the vast majority of cases, the appropriate treatment is administration of medication in an outpatient setting, such that the hospitalization requirement is irrelevant for most patients with ectopic pregnancies. It is only the occasional case of ectopic pregnancy that develops into an emergency requiring treatment based in a hospital.

69. Furthermore, I understand the West Virginia law defines "nonviable" as a lethal anomaly in an embryo or fetus. However, as is the case with all non-emergency abortions, there is no medical reason to require the hospitalization of all patients seeking an abortion in the case of a lethal anomaly.

---

[123] Skop Decl. ¶¶ 40, 56.

[124] Board of Medicine Defendants' Brief in Support of Motion to Dismiss at 14.

***

70. For all of these reasons, in my opinion and experience, procedural and medication abortion are well-documented as extremely safe, and the additional restrictions placed on legal procedural and medication abortion in West Virginia are entirely illogical and harmful.

//

//

//

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 14, 2023

MARK D. NICHOLS, M.D.