THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| WOMEN'S HEALTH CENTER OF WEST VIRGINIA, *on behalf of itself, its staff, and its patients*; and DR. JOHN DOE, *on behalf of himself and his patients*, | |
| *Plaintiffs*, | |
| v. | |
| ASHISH P. SHETH, *in his official capacity as President of the West Virginia Board of Medicine*; and MATTHEW CHRISTIANSEN, *in his official capacity as Secretary of the West Virginia Board of Medicine*, | Civil Action No. 2:23-cv-00079 <br><br> Hon. Irene C. Berger |
| *Defendants*, | |
| and | |
| THE STATE OF WEST VIRGINIA, | |
| *Defendant-Intervenor*. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

    I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims ..........................2

         A.     Plaintiffs Have Article III and Prudential Standing ................................2

              1.     Plaintiffs' Injuries Are Traceable to the Privileges Requirement ...............................................................................3

              2.     Plaintiffs Have Third-Party Standing to Assert the Rights of Patients ........................................................................6

         B.     Plaintiffs Are Likely to Succeed on the Merits of Their Due Process Claim .............................................................................10

              1.     The Hospitalization Requirement Is Irrational ............................12

              2.     The Privileges Requirement Is Irrational ....................................17

         C.     Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim .........................................................................20

         D.     The Care Restrictions Are Non-Severable from the Entirety of HB 302 ....................................................................................22

    II.     Plaintiffs Are Suffering Irreparable Harm .........................................................23

    III.    The Balance of Equities and Public Interest Weigh Strongly in Favor of an Injunction ......................................................................................................25

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton*,
  521 U.S. 203 (1997) ...........................................................................................7

*Borden's Farm Prods. Co. v. Baldwin*,
  293 U.S. 194 (1934) .........................................................................................11

*Brantley v. Kuntz*,
  98 F. Supp. 3d 884 (W.D. Tex. 2015) ....................................................... 18, 22

*Caplin & Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989) ...........................................................................................8

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) .........................................................................................20

*Craig v. Boren*,
  429 U.S. 190 (1976) .......................................................................................7, 9

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002) ........................................................ 14, 21, 22, 24

*DiCocco v. Garland*,
  52 F.4th 588 (4th Cir. 2022) .....................................................................1, 3, 5

*Dobbs v. Jackson Women's Health Org.*,
  141 S. Ct. 2619 (2021) .......................................................................................7

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ..........................................................................2, 20, 22

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972) ...........................................................................................8

*Engquist v. Or. Dep't of Agric.*,
  553 U.S. 591 (2008) .........................................................................................21

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) .........................................................................................24

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ...........................................................................................8

*Harris v. Bd. of Supervisors*,
  366 F.3d 754 (9th Cir. 2004) ...........................................................................24

ii

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Harris v. McRae*,
    448 U.S. 297 (1980) .............................................................................................21

*Heller v. Doe*,
    509 U.S. 312 (1993) .............................................................................................11

*Isaacson v. Horne*,
    716 F.3d 1213 (9th Cir. 2013) ...............................................................................5

*June Medical Services L.L.C. v. Gee*,
    905 F.3d 787 (5th Cir. 2018) .................................................................................5

*June Med. Servs. L.L.C. v. Russo*,
    140 S. Ct. 2103 (2020) ............................................................................. 5, 6, 17

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ...............................................................................................6

*Laufer v. Naranda Hotels, LLC*,
    60 F.4th 156 (4th Cir. 2023) ..................................................................................7

*Lebron v. Sec'y of Fla. Dep't of Children & Fams.*,
    772 F.3d 1352 (11th Cir. 2014) ...........................................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...............................................................................................3

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................2, 3

*Mathews v. Lucas*,
    427 U.S. 495 (1976) .............................................................................................16

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008) ...............................................................................16

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) ...............................................................................23

*Mowbray v. Kozlowski*,
    725 F. Supp. 888 (W.D. Va. 1989) ......................................................................24

*Nw. Mem'l Hosp. v. Ashcroft*,
    362 F.3d 923 (7th Cir. 2004) ...............................................................................10

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*O'Day v. George Arakelian Farms, Inc.*,
536 F.2d 856 (9th Cir. 1976) ................................................................. 15

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ................................................................. 24

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
748 F.3d 583 (5th Cir. 2014) ................................................................. 9

*Planned Parenthood Southeast, Inc. v. Bentley*,
951 F. Supp. 2d 1280 (M.D. Ala. 2013) ................................................. 6

*Planned Parenthood of Sw. & Cent. Fla. v. State*,
2022 WL 2436704 (Fla. Cir. Ct. July 5, 2022) ...................................... 15

*Planned Parenthood of Wis., Inc. v. Schimel*,
806 F.3d 908 (7th Cir. 2015) ................................................................. 6

*Powers v. Ohio*,
499 U.S. 400 (1991) ............................................................... 1, 8, 9, 10

*Pulte Home Corp. v. Montgomery Cnty., Md.*,
909 F.3d 685 (4th Cir. 2018) ................................................................. 21

*Romer v. Evans*,
517 U.S. 620 (1996) ................................................................. 11, 17, 22

*Singleton v. Wulff*,
428 U.S. 106 (1976) ................................................................. 7, 9, 10

*Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*,
535 F. Supp. 3d 548 (S.D. W. Va. 2021) ............................................... 25

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) ................................................. *passim*

*Stuart v. Camnitz*,
774 F.3d 238 (4th Cir. 2014) ................................................................. 16

*Taylor v. Clay Cnty. Sheriff's Dep't*,
2020 WL 890247 (S.D. W. Va. Feb. 24, 2020) ...................................... 22

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ............................................................................. 17

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Day*,
  700 F.3d 713 (4th Cir. 2012) ................................................................................6

*Warth v. Seldin*,
  422 U.S. 490 (1975) .........................................................................................6, 7

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ...............................................................................................8

*Weinberger v. Wiesenfeld*,
  420 U.S. 636 (1975) ............................................................................................11

*Whole Women's Health v. Hellerstedt*,
  579 U.S. 582, 136 S. Ct. 2292 (2016) ................................................................16

**Statutes**

W. Va. Code
  § 16-2M-4(a) .......................................................................................................13
  § 16-2O-1(b) ........................................................................................................13
  § 16-2R-1 .............................................................................................................12
  § 16-2R-2 .............................................................................................................21
  § 16-2R-3(b)–(c) ..................................................................................................14
  § 16-2R-3(f) .........................................................................................................12

**Other Authorities**

Am. Med. Ass'n, *9.5.2 Staff Privileges*, https://code-medical-ethics.ama-
  assn.org/ethics-opinions/staff-privileges ............................................................18

Petition for Writ of Certiorari, *Dobbs v. Jackson Women's Health Org.*,
  141 S. Ct. 2619 (No. 18-60868)............................................................................7

Senate Bill 552, 2023 Reg. Sess. (W. Va. 2023) ......................................................23

## INTRODUCTION[1]

Defendant Members of the Board of Medicine ("BOM Members") and Defendant-Intervenor the State ("the State") (collectively, "Defendants") present no credible response to Plaintiffs' showing that the Care Restrictions are unconstitutional, and that a preliminary injunction is necessary to avert this irreparable harm.

Plaintiffs satisfy Article III's standing requirements. The BOM Members do not dispute Plaintiffs' first-party standing to challenge the Hospitalization Requirement. And with respect to first-party standing to challenge the Privileges Requirement, the State quibbles only with traceability. W. Va. Resp. to Mot. for Prelim. Inj. ("State Br.") 5–7 (Dkt. 38). But the State's effort to recast the impact of the Privileges Requirement as products of Plaintiffs' "own choices," *id.* at 6, is wrong on the law and the facts. Plaintiffs need only show their injury is "fairly traceable" to HB 302, *DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (en banc), and the record shows it would be impossible for Dr. Doe to obtain hospital privileges or for WHC's other physician, who has privileges, to maintain them if he practiced at WHC more than occasionally. Defendants' attack on Plaintiffs' prudential standing to assert the rights of their patients is equally misplaced. Courts recognize third-party standing where a litigant has "a close relationship to the third party" and there exists "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). The close relationship between doctor and patient, and the significant personal, logistical, and economic barriers that deter abortion patients from filing suit, easily suffice to establish third-party standing.

---

[1] Unless otherwise indicated, all emphases are added, all internal citations and quotations omitted, and all defined terms have the same meaning given in Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction (Dkt. 10).

On the merits, Defendants fail to provide any basis to dispute that the Care Restrictions are irrational. To start, they suggest that *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), gave them *carte blanche* to defend the Hospitalization and Privileges Requirements by simply invoking an interest in "fetal life" and "the life of the unborn." State Br. 10, 16; BOM Resp. to Pls.' Mot. for Prelim. Inj. ("BOM Br.") 7–8, 11 (Dkt. 37). But these requirements apply only to those abortions the Legislature has explicitly chosen to *permit*. In other words, the Legislature has already decided that the interest in fetal life does not justify restricting access to those abortions, so the challenged provisions cannot logically serve that interest. Nor do Defendants adequately explain why suddenly imposing such dramatic and unprecedented restrictions on abortion care—which has safely been provided in the outpatient setting, by physicians without hospital privileges, in West Virginia for nearly half a century—bears any rational relationship to a legitimate interest in health and safety. Instead, the State turns to junk science to try to rationalize the Care Restrictions as somehow in step with modern medicine. They are not, as shown by the overwhelming scientific consensus and decades of real-world experience, set forth in the record.

Because the Care Restrictions lack any rational relationship to a legitimate state interest, the Court should issue a preliminary injunction.

## ARGUMENT

### I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims

#### A.      Plaintiffs Have Article III and Prudential Standing

Defendants do not challenge Plaintiffs' first-party standing with respect to the Hospitalization Requirement. Nor do they dispute that Plaintiffs have shown injury in fact and redressability as to the Privileges Requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (Article III standing requires plaintiffs to establish (1) injury in fact; (2) a causal

connection between the injury and the conduct complained of (*i.e.*, traceability); and (3) a substantial likelihood of redressability). Instead, Defendants argue that Plaintiffs cannot establish prudential standing to assert the interests of their patients, while the State further argues that Plaintiffs have not shown their injuries are traceable to the Privileges Requirement for purposes of Article III standing. These arguments are meritless.

### 1.    Plaintiffs' Injuries Are Traceable to the Privileges Requirement

"To satisfy standing's causation requirement, the alleged injury must be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *DiCocco*, 52 F.4th at 592 (quoting *Lujan*, 504 U.S. at 560). A defendant need not be the only cause of a plaintiff's injury; "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).

**WHC.**   The State argues that WHC's injuries are not traceable to the Privileges Requirement but to "its own choices" because a doctor who has local hospital privileges, but only works at WHC two half-days per month, could choose to rearrange his schedule to provide additional care at WHC, or WHC could hire another doctor with West Virginia privileges to replace Dr. Doe. *See* State Br. 5–6. But these "solutions" are counter-factual and unrealistic. The physician at issue cannot provide abortion care at WHC beyond "two half-days per month" because of "his schedule and the obligations of his private and hospital practice." Decl. of Katie Quiñonez in Supp. of Pls.' Mot. for Prelim. Inj. ("Quiñonez Decl.") ¶¶ 18, 40 (Dkt. 3-1). The State cites no authority suggesting that a physician must take such extreme measures as fundamentally altering his medical practice to establish standing. Moreover, even if this physician were to abandon his private and hospital practice to work full-time at WHC, he would not be able to maintain his privileges, and thus would still be barred from providing abortion care at WHC.

Rebuttal Decl. of Katie Quiñonez in Supp. of Pls.' Mot. for Prelim. Inj. ("Quiñonez Rebuttal Decl.") ¶¶ 3–5. And there is no basis for the State's unfounded speculation that WHC simply can hire another physician with West Virginia privileges. Quiñonez Rebuttal Decl. ¶¶ 8–10; Decl. of Sharon Lewis in Supp. of Pls.' Mot. for Prelim. Inj. ("Lewis Decl.") ¶¶ 3–5; *see also* Pls.' Mem. of L. in Supp. of Mot. for Prelim. Inj. ("Pls. Br.") 25–26 (Dkt. 10). Indeed, physicians who provide outpatient abortion care are typically barred from obtaining such privileges precisely because abortion is so safe it almost never results in hospital-based care. *See* Decl. of Mark D. Nichols, M.D., in Supp. of Pls.' Mot. for Prelim. Inj. ("Nichols Decl.") ¶ 53 (Dkt. 3-6).

**Dr. Doe.** The State further argues that Dr. Doe's injuries are not traceable to the Privileges Requirement because he "has not shown a good faith effort to apply for admitting privileges." State Br. 6–7. But Dr. Doe has explained in detail why he does not qualify for any of the categories of Charleston Area Medical Center's ("CAMC") privileges and that submitting a futile application could have "serious adverse professional consequences," including because he must report any privileges applications that have been denied or even withdrawn in applying for or renewing his medical licenses. Decl. of Dr. John Doe in Supp. of Pls.' Mot. for Prelim. Inj. ("Doe Decl.") ¶¶ 39–52 (Dkt. 3-2).[2] Dr. Doe also explained that, since he only provides medical care in Charleston, it would be that much more futile—and harmful—to apply for privileges at a hospital outside

---

[2] Dr. Skop, *see infra* n.10, speculates that "Dr. Doe *might* be able to gain admitting privileges as courtesy or consulting staff," State Br. 7, but is mistaken. The record establishes that CAMC permits abortions to be performed at the hospital only in extremely rare, emergency cases, Quiñonez Decl. ¶ 21; Quiñonez Rebuttal Decl. ¶ 6; Lewis Decl. ¶ 6, so Dr. Doe cannot simply start providing "surgical abortions" at the hospital to satisfy the minimum patient requirements for Courtesy Staff privileges. Decl. of Ingrid Skop, M.D., F.A.C.O.G. ("Skop Decl.") ¶ 54 (Dkt. 38-1). And because Dr. Doe is a family medicine doctor, not a specialist, he cannot obtain Consulting Staff privileges, which are reserved for doctors who can offer expertise not found among a hospital's staff. Doe Decl. ¶¶ 46–47. Further, Dr. Skop does not deny that Dr. Doe risks professional harm if he submits a weak or futile privileges application that is subsequently withdrawn or denied.

Charleston in a community he never intends to visit. *Id.* ¶¶ 11, 52. The State does not refute the significant risks Dr. Doe faces from a rejected or withdrawn application, and the law does not require Dr. Doe to jeopardize his medical career to obtain standing in this case. *See, e.g.*, *DiCocco*, 52 F.4th at 592 (holding that psychiatrist did not lose standing by resigning without first taking challenged physical fitness test imposed as condition of employment, as "[p]erhaps Dr. DiCocco's choice to resign rather than retake the test was a proximate cause of her injuries[,] [b]ut that does not defeat standing"); *cf. Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013) (holding physicians had standing to challenge the constitutionality of abortion ban whether they continued performing abortions and risked prosecution or stopped performing them to avoid penalties).

Nor does the State dispute that it would be nonsensical for Dr. Doe to apply for privileges at hospitals in parts of the state where he does not actually see patients or practice medicine at all. And, while the State criticizes Dr. Doe for reviewing only CAMC's privileges requirements, *see* State Br. 6, Dr. Doe's review was necessarily limited because the privileges requirements from other major hospitals in West Virginia are not readily available, Decl. of Bren J. Pomponio in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 3–4. Indeed, the State itself does not reference any other hospital's requirements—much less suggest how they might differ from CAMC's.

The sole authority cited by the State in support of its contention that a doctor must first apply for privileges to establish standing is the Fifth Circuit's decision in *June Medical Services L.L.C. v. Gee*, 905 F.3d 787 (5th Cir. 2018), *rev'd sub nom. June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103 (2020). *See* State Br. 7. But that decision is plainly inapposite: it did not concern the necessary showing for Article III standing to challenge an admitting privileges requirement, but the sufficiency of the evidence required to prove an undue burden, *June Med. Servs.*, 905 F.3d at 807, on which ground it was reversed, *June Med. Servs.*, 140 S. Ct. at 2132.

Ignored by the State is that other courts have granted preliminary relief in these cases without first requiring that physicians apply for privileges. For example, in *Planned Parenthood Southeast, Inc. v. Bentley*, 951 F. Supp. 2d 1280 (M.D. Ala. 2013), the district court granted a temporary restraining order against an admitting privileges requirement, explaining as follows:

> The defendants dispute that the plaintiffs' clinics and physicians cannot meet the staff privileges requirement and contend that the hospitals' prerequisites are not as stringent as the plaintiffs submit. However, based on the record as it stands, the court finds the plaintiffs' assertions to be credible. Further, plaintiffs have credibly asserted that applying for staff privileges and being denied can render significant harm to a physician's professional reputation. . . . ***The plaintiffs' physicians should not be required to risk damage to their professional reputations in order to test their ability to comply with this law, particularly where it seems highly unlikely that an attempt to obtain staff privileges would be successful.***

*Id.* at 1283 n.1; *see also Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 911–12 (7th Cir. 2015) (Posner, J.) (explaining challenges plaintiffs faced in obtaining privileges, which can take several months, and noting that physicians did not have privileges at preliminary injunction stage). This Court should do the same.

## 2.    Plaintiffs Have Third-Party Standing to Assert the Rights of Patients

Plaintiffs also have prudential standing to sue on behalf of their patients. Defendants' arguments to the contrary would require this Court to disregard decades of binding jurisprudence.

Third-party standing is a long-established exception to the prudential—not jurisdictional— rule that a plaintiff "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see, e.g.*, *United States v. Day*, 700 F.3d 713, 721 (4th Cir. 2012) ("Unlike Article III standing, issues of prudential standing are non-jurisdictional[.]"). This doctrine recognizes that "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). The longstanding application of this doctrine in the context of abortion providers and patients, *see generally June Medical*, 140 S. Ct. at 2118, derived not from the heightened federal constitutional protection for abortion

recognized in *Roe*, but from these general prudential principles. *See Craig v. Boren*, 429 U.S. 190, 196–97 (1976) (recognizing third-party standing of beer sellers on behalf of their customers because "the obvious claimant" and "least awkward challenger" is the party upon whom the challenged statute imposes "legal duties and disabilities"); *Singleton v. Wulff*, 428 U.S. 106, 114–18 (1976) ("[I]t generally is appropriate to allow a physician to assert the rights of [patients] as against governmental interference with the abortion decision" because abortion access "is inextricably bound up with the activity the [provider] litigant wishes to pursue.").

Defendants nonetheless contend that by overruling *Roe* and *Casey*, *Dobbs* overruled *sub silentio* all prior cases concerning third-party standing in the abortion context. State Br. 8; BOM Br. 17–18. This argument is wrong. To start, it conflates the merits with justiciability. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," *Warth*, 422 U.S. at 500, and therefore it is not the case that every time the Supreme Court overturns a prior decision on the *merits*, it is also implicitly concluding the plaintiffs lacked standing. *Accord Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (applying *Warth*). Nor was this question before the Court in *Dobbs*, as the Supreme Court expressly refused to grant certiorari on the question of whether the plaintiffs in *Dobbs* lacked third-party standing.[3] As such, this Court cannot disregard binding third-party standing precedent. *See Agostini v. Felton*, 521 U.S. 203, 207 (1997) ("[L]ower courts should follow the case which directly controls.").[4]

---

[3] *See* Petition for Writ of Certiorari, *Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (No. 18-60868); *Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619, 2620 (2021) (granting certiorari only on first question presented).

[4] The *dicta* in the *Dobbs* majority opinion that "criticized" its prior third-party standing cases in the abortion context, State Br. 8, does not relieve this Court from binding precedent. *See, e.g.*, *Agostini*, 521 U.S. at 237.

Plaintiffs here easily satisfy the elements of third-party standing, which are that: (1) "[t]he litigant must have suffered an 'injury in fact'"; (2) "the litigant must have a close relation to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers*, 499 U.S. at 410–11. As to the first element, Plaintiffs plainly have suffered injury in fact in their own right, as explained above. *See supra* Section I.A.1. As to the second, the doctor-patient relationship is demonstrably a close one "of special consequence." *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623 n.3 (1989) (discussing *Eisenstadt v. Baird*, 405 U.S. 438, 443–46 (1972)); *see also, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 707–08 (1997) (permitting physicians to raise claims on behalf of terminally ill patients even after patients had died); *Griswold v. Connecticut*, 381 U.S. 479, 480–81 (1965) (holding that physician dispensing advice about contraception had "standing to raise the constitutional rights of the married people with whom [he] had a professional relationship").

Defendants seek to downplay this uniquely close relationship, claiming the short duration of a procedural abortion leaves a physician without any meaningful relationship to the patient. *See* State Br. 8–9; *see also* BOM Br. 17–18. But the strength of a physician-patient relationship does not turn on the length of the procedure itself, nor does any legal authority support such a notion. Regardless, the record amply demonstrates the meaningful relationship Plaintiffs develop with their patients. Quiñonez Rebuttal Decl. ¶¶ 11–12 (describing abortion patients who return to WHC for other care); Rebuttal Decl. of Dr. John Doe in Supp. of Pls.' Mot. for Prelim. Inj. ("Doe Rebuttal Decl.") ¶¶ 3–4. Moreover, Dr. Doe and WHC staff undertake significant personal risks to provide abortion care—further evidence of the closeness of their relationship with their patients. Doe Rebuttal Decl. ¶ 5; Quiñonez Rebuttal Decl. ¶¶ 13–14.

The State also seeks, without basis, to question the alignment of interests between abortion providers and their patients. State Br. 9. Such an alignment of interests exists here, where patients' ability to access care is "inextricably bound" with Plaintiffs' ability to provide it. *Singleton*, 428 U.S. at 114; *cf., e.g.*, *Powers*, 499 U.S. at 413–14 (finding close relation between criminal defendant and excluded jurors satisfied because they "have a common interest in eliminating racial discrimination from the courtroom . . . [a]nd, there can be no doubt that [defendant] will be a motivated, effective advocate for the excluded venirepersons' rights"). The State contends that these interests are not aligned because "Plaintiffs would profit by being able to perform more abortions free from the Act's challenged requirements." State Br. 9. But the fact that Plaintiffs are paid for the services they seek to provide is not legally relevant. *See, e.g.*, *Craig*, 429 U.S. at 196–97 (holding vendor had third-party standing to challenge purported safety restriction on beer sales on behalf of customers). Moreover, this argument is baseless speculation that abortion providers would prioritize profits above professional obligations and ethics, *cf.* Doe Rebuttal Decl. ¶ 6, and it thus has been correctly rejected by other courts, as the Court should do here. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 n.9 (5th Cir. 2014) (rejecting state's argument that "the doctor's economic incentives regarding the performance of abortions may not always align with a woman's right to choose to have an abortion" and finding no conflict of interest).

As to the third element of third-party standing, "genuine obstacle[s]" hinder patients' ability to assert their own right to abortion. *Singleton*, 428 U.S. at 112–16. In many cases, patients' "desire to protect the very privacy of [their] decision[s] [to terminate pregnancies] from the publicity of a court suit" due to stigma around abortion and the intimate nature of reproductive

decision-making will prevent them from suing on their own behalf. *Id.* at 117.[5] Abortion patients are regular targets of threatening, violent behavior, as well as targets of societal stigma. *See* Quiñonez Rebuttal Decl. ¶¶ 8, 14; Lewis Decl. ¶ 8. Such circumstances present a "genuine obstacle" to patients' assertion of their own abortion rights. Additionally, as the Supreme Court has recognized, the inherently time-limited nature of pregnancy and time-sensitive nature of abortion necessarily present potential mootness issues. *Singleton*, 428 U.S. at 117–18. And even if a mootness exception applies as a legal matter, in many cases it simply will be impossible for a pregnant litigant to obtain relief against an abortion restriction in time to personally benefit from a favorable decision, making the prospect of litigation, and its unavoidable financial and emotional costs, even more daunting. In any event, the third-party standing test does not require there be no hypothetical circumstance where a patient could vindicate their own interests, merely that there be "some hindrance," *Powers*, 499 U.S. at 411, or "a genuine obstacle" to the patient's assertion of their interests, *Singleton*, 428 U.S. at 116. Such genuine obstacles exist for the reasons explained above, and Plaintiffs thus have third-party standing to assert the interests of their patients.

**B.    Plaintiffs Are Likely to Succeed on the Merits of Their Due Process Claim**

Defendants fail to provide any persuasive response to Plaintiffs' showing that the Care Restrictions are irrational and violate the Due Process Clause.

---

[5] The fact that a plaintiff may sue under a pseudonym is not a panacea. *See* State Br. 9. For example, that typically does not protect their identity from their litigation counterparties. Nor does it necessarily prevent their family, friends, colleagues, and/or others in their community from deducing their identity from other facts revealed through litigation. *Cf. Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (recognizing that when de-identified patient records "are made a part of the trial record . . . persons of their acquaintance, or skillful 'Googlers,' sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, 'out' [abortion patients], and thereby expose them to threats, humiliation, and obloquy").

At the outset, Defendants invoke the unremarkable proposition that rational basis review is deferential. *See, e.g.*, BOM Br. 7–12; State Br. 10–13. But "even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993). In other words, rational basis review still requires judicial *review*—it does not simply impose "a conclusive presumption, or a rule of law which makes legislative action invulnerable to constitutional assault," and it does not grant the state license to "treat[] any fanciful conjecture as enough to repel attack." *Borden's Farm Prods. Co. v. Baldwin*, 293 U.S. 194, 210 (1934). A state may not rely on "the mere recitation of a benign, compensatory purpose" to "automatic[ally] shield" itself "against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975). And courts must "insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). Here, Defendants fail to proffer a justification for the Care Restrictions that has any "footing in the realities of the subject addressed by the legislation," for none exists. *Heller*, 509 U.S. at 321.

Additionally, Defendants have effectively conceded that the Care Restrictions may be justified only if they bear a logical relationship to "protect[ing] women's health and safety" and the related goal of "maintain[ing] integrity in the medical profession,"[6] which, as detailed below, they do not. State Br. 10; *see also* BOM Br. 8. Although Defendants make passing reference to an interest in "protect[ing] fetal life" and "the life of the unborn," State Br. 10, 16; BOM Br. 7–8, 11, that interest has no application in this case. The Legislature made clear that HB 302 was intended to advance its "interest in protecting unborn lives and prohibiting abortions . . . *except in the*

---

[6] While Defendants refer in passing to this interest, they nowhere articulate it in any way that differs from the state interest in advancing health and safety, suggesting that the two interests are coextensive in this case. *See, e.g.*, BOM Br. 8, 11; State Br. 10.

*circumstances set forth in [Article 16-2R].*" W. Va. Code § 16-2R-1. In other words, the Legislature has expressly disclaimed any interest in "protecting unborn lives" with respect to the abortions it chose to *permit* under Article 2R—such as those to which the Care Restrictions apply. Accordingly, the question presented is whether the Care Restrictions are rationally related to legitimate governmental interests relating to health and safety. As shown below, they are not.

### 1. The Hospitalization Requirement Is Irrational

HB 302's requirement that all procedural abortions be performed only in hospitals is so detached from medical reality and common sense that it bears no plausible relationship to any legitimate governmental interest. Pls. Br. 16–23; *see* W. Va. Code § 16-2R-3(f). Defendants do not dispute that procedural abortion is universally provided as outpatient health care and has been provided in an outpatient setting in West Virginia, specifically, for nearly fifty years with a clear record of impeccable safety. Nor do they identify any scientific or medical revolution in the last year that could justify such a drastic and unprecedented change to the status quo.

Instead, Defendants invoke unfounded safety concerns, *i.e.*, that "the Legislature may rationally believe that hospitals are better equipped to handle nonviable or ectopic pregnancies and/or medical emergencies" permitted under HB 302 and that "these now-legal abortions can be provided more safely in the hospital setting given that some pre-existing malady to the mother or fetus must be present." BOM Br. 12; *see also* State Br. 10–14. However, these arguments are belied by the plain text of the statute, incontrovertible medical fact, and common sense. First, HB 302 does not mandate that abortions in cases of ectopic pregnancies take place in a hospital; the standard of care for an ectopic pregnancy is the use of medication to terminate the pregnancy, Rebuttal Decl. of Mark D. Nichols, M.D. in Further Supp. of Pls.' Mot. for Prelim Inj. ("Nichols Rebuttal Decl.") ¶ 68, so that care can still be provided in the outpatient setting. Second, regardless of whether medication or an abortion procedure is used—and thus, regardless of whether these

abortions are covered by the Hospitalization Requirement—medical emergencies are not treated in the outpatient setting (and the Hospitalization Requirement is not limited to medical emergencies, in any event). West Virginia abortion law has long had the same medical emergency exception,[7] and the record shows that WHC, the sole abortion clinic in West Virginia, has never provided care under these circumstances. Third, again, regardless of whether medication or an abortion procedure is used—and thus, regardless of whether these abortions are covered by the Hospitalization Requirement—Defendants fail to explain why it is rational to believe that terminating a pregnancy *after* it has been determined to be nonviable is safer in a hospital. While a pregnant person with a pre-existing medical condition might need hospital-based care to protect their health during the procedure, Defendants do not explain why or how such reasoning applies when the embryo or fetus that is the subject of the abortion cannot survive outside the uterus. *See also* Nichols Rebuttal Decl. ¶ 69.[8]

The BOM Members' suggestion that "hospitals are better suited to provide social services to victims of sexual assault," "work with law enforcement," and provide "potential psychiatric or psychological care to victims," BOM Br. 12, also does not establish a rational basis for the Hospitalization Requirement. First and foremost, hospitals in West Virginia do not permit physicians to use their facilities to provide abortion care in these circumstances. *See, e.g.*, *infra* at 16, 24–25. Rather, this care has been exclusively provided by outpatient abortion providers in West Virginia, like WHC, which have decades of experience treating patients in these circumstances, including by providing and referring patients for related services and liaising with law

---

[7] *See, e.g.*, W. Va. Code § 16-2M-4(a); *id.* § 16-2O-1(b).

[8] It is already the case that outpatient health care providers—whether of abortion or any other treatment or procedure—only provide care to those patients who, by definition, can be seen in the outpatient setting. Nichols Decl. ¶¶ 33, 37–41; Doe Decl. ¶ 24.

enforcement. Quiñonez Decl. ¶¶ 11, 44; Quiñonez Rebuttal Decl. ¶¶ 6–7.[9] Second, even if hospitals did provide this care, the BOM Members' claims that the care would be enhanced in the hospital setting are based on wholly irrational presumptions about how health care is provided today. *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) (holding that "a hypothetical rationale . . . cannot be fantasy"). Specifically, the BOM Members' claims rely on the fanciful notion that, even though HB 302 does not require them to do so, were a physician to schedule a hospital operating room to perform a time-sensitive abortion procedure in a case of sexual assault, the physician and/or hospital would also call in psychologists, psychiatrists, and/or other health care providers to serve the patient's broader physical and mental health needs, and that all of this would occur at the time the abortion itself is provided, regardless of other demands on these health care providers and the patient's insurance coverage or ability to pay. There is no basis for such an unfounded assumption. Rather, if the hospital offers any patient services like these, it would be by referring them to community providers, just as WHC does. Quiñonez Rebuttal Decl. ¶ 7; *see also* Quiñonez Decl. ¶ 11. Ensuring survivors of sexual assault can access such care is undoubtedly a legitimate government interest, but to satisfy rational basis review, a law must regulate so as to actually advance that interest, which the Hospitalization Requirement plainly does not. *See Craigmiles v. Giles*, 312 F.3d 220, 225–26 (6th Cir. 2002) (holding that because licensing requirement did not actually require licensees to counsel their customers on the harms of low-quality caskets or even to sell high-quality caskets, "restricting the retailing of caskets to licensed funeral directors bears no rational relationship" to those legitimate interests).

---

[9] Notably, nothing in HB 302 requires providers to "work with law enforcement"—it requires the *patient* to obtain a report from law enforcement or, for minors or incompetent or incapacitated adults, obtain medical treatment for sexual assault or incest. *See* W. Va. Code § 16-2R-3(b)–(c).

Meanwhile, the State argues that the Legislature could have believed that procedural abortions "can be more safely provided in hospitals because hospitals are better equipped to address any complications that arise," State Br. 10, notwithstanding that first and second trimester abortions have been provided almost exclusively in the outpatient setting for nearly half a century and that several decades of case law establish that hospitalization requirements *do not* enhance patient health and safety. This argument fails on the facts and the law. First, the Legislature is not legislating against a blank slate. Even were such an assumption rational in a bygone era, it is no longer rational in the face of generations of medical practice and experience. And *Dobbs*'s change to the *legal standard* governing abortion regulations does not call into question the Supreme Court's repeated finding that no evidence supports requiring hospitalization for abortion as a factual matter. *See* Pls. Br. 21–22.

Second, prohibiting *all* outpatient procedural abortions because of a risk of complications that arises in 0.16% of cases, Nichols Decl. ¶ 26, is so wildly disproportionate as to be irrational. *See, e.g.*, *O'Day v. George Arakelian Farms, Inc.*, 536 F.2d 856, 860 (9th Cir. 1976) (holding law irrational where "grossly excessive" in relation to government interest).[10] WHC's own safety record only underscores the point: In the last five years, less than one half of one percent of WHC's procedural abortion patients received *any* hospital care following an abortion. Quiñonez Decl.

---

[10] The testimony of the State's expert Dr. Skop should be given no weight. Another court recently found her unqualified and her testimony on similar topics unreliable and non-credible. *Planned Parenthood of Sw. & Cent. Fla. v. State*, 2022 WL 2436704, at *13 (Fla. Cir. Ct. July 5, 2022) ("Overall, Dr. Skop has no experience in performing abortions; admitted that her testimony on the risks of certain abortion complications was inaccurate and overstated, or based on data from decades ago; admitted that her views on abortion safety are out of step with mainstream, medical organizations; and provided no credible scientific basis for her disagreement with recognized high-level medical organizations in the United States."); *see generally* Nichols Rebuttal. Decl. She has never held an academic position and did not author any publications for most of her career. Suppl. Decl. of Darina A. Shtrakhman in Supp. of Pls.' Mot. for Prelim. Inj., Ex. A at 220:7–12. She also has admitted that she plagiarized portions of articles. *Id.* at 245:19–256:17, 258:4–7.

¶ 24. As such, the State's argument proves too much: No medical procedure is without risk, and hospitals generally have the staff and facilities required to treat complications. But taken to its logical conclusion, this would mean it is rational to force any and all medical procedures, no matter how minor, into a hospital operating room. That is not "*reasonable* regulation of the medical profession." *Stuart v. Camnitz*, 774 F.3d 238, 254 (4th Cir. 2014); *see generally Mathews v. Lucas*, 427 U.S. 495, 510 (1976) (rational basis standard "is not a toothless one").

Finally, Defendants do not dispute Plaintiffs' testimony that hospitals in West Virginia are and have long been unwilling to provide abortion care, except in emergencies. *See, e.g.*, Quiñonez Decl. ¶ 21; Quiñonez Rebuttal Decl. ¶ 6; Lewis Decl. ¶ 6. Thus, even assuming the purported health and safety benefits of the Hospitalization Requirement generally, the requirement would not result in West Virginia hospitals providing "safer" procedural abortions; it would result in no procedural abortions being provided anywhere in the state, thereby forcing patients to travel outside West Virginia to clinics inundated by out-of-state patients desperate for care. Defendants simply cannot claim that "health and safety" are rationally served when this will be the result. *Cf. Whole Women's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 2318 (2016) (finding alleged health and safety restriction "harmful to, not supportive of, women's health" where it "force[d] women to travel long distances to get abortions in crammed-to-capacity superfacilities," where they "are less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered"); *Merrifield v. Lockyer*, 547 F.3d 978, 992 (9th Cir. 2008) (holding state licensing requirement failed rational basis where "the government has undercut its own rational basis" by imposing regulation that would only exacerbate pesticide-related problems it purported to address).

16

In short, laws that are not rationally connected to the State's asserted rationale and based on "wholly unsubstantiated assumptions" cannot survive rational basis review. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535–36 (1973); *see also Romer*, 517 U.S. at 632; Pls. Br. 15 (citing cases). The Hospitalization Requirement fails under this standard.

### 2.    The Privileges Requirement Is Irrational

Likewise, Defendants fail to articulate any rational relationship between the Privileges Requirement and a legitimate government interest.[11] As with the Hospitalization Requirement, this restriction is unprecedented in West Virginia law and flies in the face of nearly fifty years of medical practice. And, as with the Hospitalization Requirement, the Legislature was on notice of multiple court decisions establishing that privileges requirements for abortion care have *no* "health-related benefits," and yet it enacted the Privileges Requirement anyway. *June Medical*, 140 S. Ct. at 2112. Rational basis does not permit such baseless regulation.

Defendants' attempts to argue otherwise are unavailing. ***First***, they claim that the Privileges Requirement aims to "ensure that [physicians providing abortion] are well-trained, experienced, and competent." State Br. 14–15; *see also* BOM Br. 12. But this fundamentally misunderstands the function of hospital privileges, which serve economic considerations independent from an individual provider's skill or experience. Nichols Decl. ¶ 51. For example, Defendants do not dispute that hospital privileges are typically reserved for physicians who will treat or admit a sufficient number of patients to the hospital each year to justify the use of hospital resources. Pls. Br. 24; *see* Nichols Decl. ¶ 49; Doe Decl. ¶ 27.[12] Nor do they dispute that, as ACOG

---

[11] As Plaintiffs have explained, the Privileges Requirement effectively applies only to medication abortion. Pls. Br. 7–8.

[12] In fact, while the American Medical Association opinion cited by the State says that hospitals should "[a]void basing privilege decisions on[] . . . numbers of patients the candidate has admitted

itself has recognized, these factors typically preclude physicians who provide abortion care on an outpatient basis, like Dr. Doe, from obtaining privileges for reasons wholly unconnected to experience and competence. Nichols Decl. ¶¶ 49–53; *see* Pls. Br. at 23–24. Likewise, Defendants do not dispute that family medicine physicians, like Dr. Doe, who provide primary care services almost never admit patients or use any hospital privileges they might have. Doe Decl. ¶¶ 28–29; *see also id.* ¶ 46. In short, as ACOG has also recognized, in light of the divide between hospital-based and outpatient care in modern medicine, Nichols Decl. ¶ 53 (quoting ACOG finding), it is not rational to presume a physician lacks adequate training, experience, or competence simply because they do not work in a hospital.[13]

As such, there is a logical disconnect between the legitimate state interest in ensuring physician training, experience, and competence and using hospital privileges as the defining criterion for determining a physician's training, experience, and competence to provide abortions. *Cf., e.g.*, *St. Joseph Abbey*, 712 F.3d at 226 ("That Louisiana . . . does not require funeral directors to have any special expertise in caskets leads us to conclude that no rational relationship exists between public health and safety and limiting intrastate sales of caskets to funeral establishments."); *Brantley v. Kuntz*, 98 F. Supp. 3d 884, 892 (W.D. Tex. 2015) (requiring minimum number of sinks in hair braiding schools bore no rational basis to health and safety interests because "washing hair is not involved in the braiding process").

---

to the facility," Am. Med. Ass'n, *9.5.2 Staff Privileges*, https://code-medical-ethics.ama-assn.org/ethics-opinions/staff-privileges, the CAMC Bylaws require just that. Doe Decl. ¶¶ 43, 45.

[13] Similar dynamics exist in the legal profession. For example, a family lawyer's clients may need tax advice at some point, and the family lawyer might refer her client to a tax lawyer for assistance, but it would be irrational to say that every family lawyer *must* also be able to practice tax law in order to advise clients on family law matters like childcare or divorce. Rather, it is understood that a lawyer will refer her client to a tax attorney if these needs arise, and a lawyer need only have the training, experience, and competence to provide the non-tax services they otherwise provide.

**Second**, the State blatantly misrepresents Dr. Doe's testimony in arguing that requiring physicians to have hospital privileges in order to prescribe medication abortion would enhance continuity of care in the vanishingly rare cases in which serious complications requiring hospital-based care occur. State Br. 14.[14] According to the FDA, serious adverse events (including death, hospitalization, serious infection, and bleeding requiring transfusion) from medication abortion are "exceedingly rare, generally far below 0.1% for any individual adverse event." Pls. Br. 12 (citing Nichols Decl. ¶ 45); *see also* Nichols Rebuttal Decl. ¶ 45. WHC's complication rate is even more striking: in the last five years, only *four* of WHC's thousands of medication abortion patients sought any hospital care at all, and of those four patients, only *two* sought hospital treatment in Charleston. Quiñonez Decl. ¶ 26. Thus, requiring hospital privileges to prescribe these medications on the basis that it has some impact on treatment of serious complications is just as wildly disproportionate and irrational as the Hospitalization Requirement. *See supra* Section I.B.1.

**Third**, even in the exceedingly rare cases involving complications, Defendants do not articulate a rational relationship between the Privileges Requirement and a legitimate government interest. To start, the claim that "patients are usually left to deal with complications at home and apparently alone," State Br. 14, blatantly distorts the truth. Patients choose these FDA-authorized medications precisely so that they can have an experience akin to miscarriage at home, outside of the clinical setting. *See, e.g.*, Nichols Decl. ¶¶ 21–22. This is an informed choice, validated by overwhelming evidence demonstrating that people are extremely satisfied with this method of

---

[14] Dr. Skop is wholly unqualified to testify about the safety of medication abortion, and her claims are uncredible and unreliable. *See supra* n.10; *see generally* Nichols Rebuttal Decl. The State's attempts to proffer its own expert testimony through the use of learned treatises must also be given no weight. State Br. 2, 11 n.2, 14 n.3; *see, e.g.*, *Lebron v. Sec'y of Fla. Dep't of Children & Fams.*, 772 F.3d 1352, 1371 (11th Cir. 2014) (explaining that courts "are hard-pressed to ascribe significance to [scientific or statistical] studies without an appropriately credentialed expert to vet" and interpret them).

abortion. Nichols Rebuttal Decl. ¶ 43. Likewise, the claim that hospital privileges enhance care because the physician who prescribed the medications has "more intimate knowledge of the patient's condition and circumstances" than another physician who may address extremely rare complications, State Br. 3; *see id.* at 14, is once again incorrect and ignores that many patients will seek care closer to home, Nichols Decl. ¶¶ 50, 59–60; Doe Decl. ¶¶ 30–35. It is uncontroverted that treating a complication from medication abortion is the same as treating a complication from miscarriage, which emergency room physicians do all the time without a prior relationship with the patient. Doe Decl. ¶¶ 33, 35; Nichols Decl. ¶ 45; Nichols Rebuttal Decl. ¶ 57. Indeed, that is why emergency rooms exist—for the rare and unexpected complication that requires no additional specialized treatment or care. In short, "continuity of care" provides no rational support for the Privileges Requirement.

### C.      Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim

The Care Restrictions also violate equal protection because they impose unique requirements on providers of abortion care, like Plaintiffs, that are not required of those who provide comparable medical care, let alone care that carries much higher risks than abortion, with no rational basis for drawing such a distinction. Pls. Br. 16–17 (Hospitalization Requirement); *id.* at 26 (Privileges Requirement). Defendants fail to justify this unequal treatment.[15]

"When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and

---

[15] Plaintiffs do not argue that the Care Restrictions violate equal protection because all abortion restrictions fail the heightened scrutiny applicable to sex-based classifications, *cf. Dobbs*, 142 S. Ct. at 2245–46, but because they violate the rational review available under the Equal Protection Clause, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

conditions." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008). Thus, even where heightened scrutiny does not apply, a court must still ensure that legislative "distinctions" are "rationally related to a legitimate state interest." *Pulte Home Corp. v. Montgomery Cnty., Md.*, 909 F.3d 685, 693 (4th Cir. 2018) (citation omitted). And where, as here, arbitrary distinctions give rise to both due process and equal protection claims, the two claims are often evaluated together. *See, e.g.*, *St. Joseph Abbey*, 712 F.3d 215; *Craigmiles*, 312 F.3d 220.

As to the Hospitalization Requirement, Defendants do not dispute that procedural abortion has lower mortality rates than many common outpatient procedures, such as colonoscopies and tonsillectomies, which are not required to be performed in hospitals. Nichols Decl. ¶ 13. Nor are other routine gynecological procedures, *i.e.*, IUD insertion, required to be performed in hospitals even though it carries a higher risk of uterine perforation than aspiration abortion. *Id.* ¶ 31. And, the Legislature has explicitly exempted miscarriage care *after* embryonic or fetal demise from the Hospitalization Requirement, even though it uses the same procedure with the same risk profile as first and early second trimester aspiration abortion. *See* W. Va. Code § 16-2R-2 (defining "abortion" to exclude "miscarriage" after "loss"); *id.* (defining "miscarriage" as the "unintended or spontaneous loss of an embryo or fetus before the 20th week of pregnancy"); Nichols Decl. ¶ 16; Nichols Rebuttal Decl. ¶ 3. As to the Privileges Requirement, Defendants do not dispute that the FDA's own data show medication abortion is *safer* than routinely prescribed drugs like penicillin or Viagra, which do not require hospital privileges. Pls. Br. 26; Nichols Decl. ¶ 44.

The State's sole response is that Supreme Court precedent allows legislators to "treat abortion differently than other medical procedures." State Br. 11, 15. But the Supreme Court has permitted differential treatment of abortion care only where the "interest in protecting the potential life of the fetus" is the relevant distinguishing factor. *Harris v. McRae*, 448 U.S. 297, 324 (1980).

As explained *supra* at 2, 11–12, that interest is not applicable here. And even if it were, Defendants have not articulated how the Care Restrictions are *rationally* related to that interest: whether or not a procedure is performed in a hospital, or medications prescribed by a physician with hospital privileges, the abortion results in the demise of an embryo or fetus.[16]

Contrary to what Defendants argue, *Dobbs* did not hold that abortion providers are entitled to less protection under the Equal Protection Clause than, for example, casket sellers or hair-braiding schools. *See St. Joseph Abbey*, 712 F.3d 215; *Craigmiles*, 312 F.3d 220; *Brantley*, 98 F. Supp. 3d 884. Rather, *Dobbs* holds that the same rational basis test that governs regulation of such services now applies to abortion providers as well. *Dobbs*, 142 S. Ct. at 2284. Thus, the Legislature cannot arbitrarily single out abortion providers and patients and impose so-called health and safety requirements on them that, as set forth above, lack any basis in medicine, science, or common sense. *Romer*, 517 U.S. at 633 (explaining that rational basis standard ensures that "classifications are not drawn for the purpose of disadvantaging the group burdened by the law").[17]

### D.    The Care Restrictions Are Non-Severable from the Entirety of HB 302

Defendants have waived any argument that the Care Restrictions are severable from the rest of HB 302. *See* Pls. Br. 28–29; *see also Taylor v. Clay Cnty. Sheriff's Dep't*, 2020 WL 890247,

---

[16] That the record shows the Care Restrictions will have the *effect* of limiting access to abortion does not compel a different conclusion. Such an argument has no logical limit, as there are any number of extreme or pretextual measures a state could take that might reduce abortion. For example, a law requiring physicians pay one million dollars for a license to provide abortions—or requiring abortion patients pay a one-million-dollar tax—would certainly reduce abortions. But to require a court to rubber-stamp such laws as "rational" would render judicial review itself irrelevant.

[17] The State's attempt to dismiss the rational basis authorities Plaintiffs identified, *see* Pls. Br. 20, as limited to "concerns about economic protectionism," State Br. 13, is unavailing. As here, those cases addressed the rationality of so-called "health and safety" laws targeted at certain professionals or services. *See, e.g.*, *St. Joseph Abbey*, 712 F.3d at 226–27; *Craigmiles*, 312 F.3d at 225; *Brantley*, 98 F. Supp. 3d at 890, 892.

at *2 (S.D. W. Va. Feb. 24, 2020) (explaining that by "fail[ing] to address any of these arguments," a party "concedes to [the opposing party's] position"). However, if Senate Bill 552, 2023 Reg. Sess. (W. Va. 2023), which amends severability provisions enacted under HB 302, becomes law through the Governor's signature, Plaintiffs respectfully request the opportunity to address its impact in supplemental briefing.

## II.   Plaintiffs Are Suffering Irreparable Harm

Absent injunctive relief, Plaintiffs and their patients will continue to suffer serious and irreparable harm for which there is no adequate remedy at law. Defendants' limited arguments to the contrary lack merit. ***First***, the BOM Members question whether the Care Restrictions are actually harming Plaintiffs and their patients. BOM Br. 18. They are. WHC has long provided abortion care to victims of rape and incest. Quiñonez Decl. ¶ 44. Further, the hospitalization requirement "means [WHC is] no longer able to provide patients with procedural abortion," and the privileges requirement "means [WHC] cannot even offer medication abortion to those patients who might be eligible." *Id.* ¶¶ 35, 37. Together, "[t]hese restrictions effectively prevent WHC from continuing to provide any abortions at all." *Id.* ¶ 34; *see also* Doe Decl. ¶¶ 2, 37–39.

***Second***, the State contends that the harms to Plaintiffs' ability to practice their profession, operate their business, and satisfy their personal and professional missions and obligations of providing comprehensive reproductive health care to people in West Virginia are neither cognizable nor irreparable. State Br. 15. But the sole case the State cites merely articulates the basic rule that "anticipated economic losses . . . recoverable at the end of litigation . . . generally will not qualify as irreparable." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019). Here, Plaintiffs are not complaining of lost funds that can later be recovered—rather, HB 302 has forced an end to their entire abortion care practice, an affront to their existence and mission. Pls. Br. 29–30. Courts have repeatedly recognized such injuries as

23

irreparable, *see id.* at 29–30, 32 (collecting cases), and the State makes no effort to engage with those cases. The State's assertion about preferred abortion methods, *see* State Br. 15, is likewise misplaced. Unlike in *Gonzales v. Carhart*, 550 U.S. 124 (2007), where the Supreme Court held that a ban on a minority method of second-trimester procedural abortion was not unconstitutional in part because "the vast majority" of second-trimester procedural abortions remained available, *id.* at 156, HB 302 does not merely disallow a minority method, but wholly eliminates Plaintiffs' ability to provide *all* abortion care.

**Third**, the State argues that there can be no irreparable harm because there is no longer a constitutional right to abortion. State Br. 16. But Plaintiffs' irreparable harm is not predicated on a constitutional right to provide or receive an abortion, just as the irreparable harm of casket sellers and hair braiders in rational basis cases is not tethered to a specific constitutional right to provide those particular services. *See St. Joseph Abbey*, 712 F.3d 215; *Craigmiles*, 312 F.3d 220. Courts have consistently recognized loss of non-constitutionally protected medical care as an irreparable harm. *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013) (finding irreparable harm where plaintiffs had lost "needed medical care"), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 765–66 (9th Cir. 2004) (establishing likelihood of irreparable harm upon showing that plaintiffs would experience pain, complications, and other adverse effects from delayed medical treatment); *see also Mowbray v. Kozlowski*, 725 F. Supp. 888, 891 (W.D. Va. 1989) (finding irreparable harm where "[f]ailure to obtain needed medical care could result in the death of some class members").

**Fourth**, the State questions whether people actually will be unable to obtain legal abortions if WHC can no longer provide such care, State Br. 16, even though WHC has been the sole known abortion provider in West Virginia for several years, *see* Quiñonez Decl. ¶ 10, and it is well-

24

established that West Virginia hospitals refuse to provide abortions in all but the most limited circumstances, Quiñonez Rebuttal Decl. ¶ 6; Lewis Decl. ¶ 6. Tellingly, the State offers no evidence that legal abortion is currently accessible in West Virginia. The irreparable harm pregnant people are experiencing and will continue to experience because legal abortion is inaccessible is more than sufficient to warrant injunctive relief. *See* Pls. Br. 32 (collecting cases).

*Finally*, the State asserts that enjoining the Care Restrictions "would cause great harm to both pregnant women and their unborn babies" because the Care Restrictions "protect women's health" and "fetal life." State Br. 16. But as Plaintiffs have explained, *see supra* Section I.B, Pls. Br. at 9–13, 16–28, the Care Restrictions have no basis in medicine and cannot serve an interest in fetal life, *see supra* at 2, 11–12.

## III. The Balance of Equities and Public Interest Weigh Strongly in Favor of an Injunction

The balance of equities decidedly favors Plaintiffs, and an injunction would serve the public interest. The State contends that enforcing HB 302 reflects the Legislature's choice to protect maternal health and fetal life. State Br. 16–17. But, as Plaintiffs have shown, the Care Restrictions do not advance those interests. Defendants ignore the severe, undisputed harm to pregnant West Virginians who are now deprived of the option to safely terminate their pregnancies. *See, e.g.*, *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d 548, 554 (S.D. W. Va. 2021) ("Potential harm to non-parties . . . also weighs in favor of injunctive relief."). The equities and public interest strongly favor preserving West Virginians' health and safety by ensuring WHC's ability to continue to provide abortion care. Pls. Br. 32–33.

### CONCLUSION

For the foregoing reasons, and those articulated in Plaintiffs' opening memorandum, this Court should grant Plaintiffs' motion for preliminary injunction.

Dated: March 20, 2023

Respectfully submitted,

/s/ *Bren J. Pomponio*

Aubrey Sparks (WVSB No. 13469)
Nicholas Ward (WVSB No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
asparks@acluwv.org
nward@acluwv.org

Alexa Kolbi-Molinas*
Rachel Reeves*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2633
akolbi-molinas@aclu.org
rreeves@aclu.org

Angeline X. Chen*
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004-2400
Phone: (202) 842-7800
axchen@cooley.com
*Admitted to practice in New York only
Not admitted to practice in Washington, DC;
supervised by active members of the
Washington, DC Bar*

Alexander Robledo*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2300
arobledo@cooley.com

*Attorneys for Plaintiffs*
* *Visiting Attorneys*

Bren J. Pomponio (WVSB Bar No. 7774)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, WV 25301
Phone: (304) 344-3144
bren@msjlaw.org

Kathleen R. Hartnett*
Kathleen Goodhart*
Julie Veroff*
Reece Trevor*
Darina A. Shtrakhman*
K.C. Jaski*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Phone: (415) 693-2000
khartnett@cooley.com
kgoodhart@cooley.com
jveroff@cooley.com
rtrevor@cooley.com
dshtrakhman@cooley.com
kjaski@cooley.com

Marc Suskin*
Patrick J. Hayden*
Michael Paul Bannon*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
msuskin@cooley.com
phayden@cooley.com
mbannon@cooley.com

26